HAWKINS, Presiding Justice,
for the Court:
Clyde Henry Powell has appealed his conviction in the circuit court of Washington County of rape of a female child under the age of fourteen years, and sentence to life imprisonment.
We find no merit in his assignments of error that there was an erroneous admission of identification testimony by the victim, and that the verdict of the jury was against the overwhelming weight of the evidence, and affirm.
FACTS
On Saturday, January 18, 1986, Rosie (not her real name), a ten-year-old child, lived with her mother Mammie Lee Holmes at 406 South 6th Street in Greenville. Her sister-in-law Terry Lynn Oliver, an adult, lived at 421 North Delta Street.
Around 3:00 p.m. Rosie rode her red bicycle to Mrs. Oliver’s house to inquire the telephone number of Rosie’s sister, Dorothy Holmes, in Columbus, Ohio. Rosie and her cousin Michael Parker had visited just earlier that afternoon with Mrs. Oliver. According to Mrs. Oliver, the two had left together, and Rosie returned alone on her bike — at Michael’s request — to get the telephone number.
En route to Mrs. Oliver’s house on this trip, when she was near the “Thrifty Food Store” on Alexander Street, Rosie heard a voice say, “Hey.” She did not see who it was.
When she got to Mrs. Oliver’s house, Mrs. Oliver did not know the telephone number and Rosie left on her bike headed home. Rosie testified at trial in January, 1987, that when she passed a man in the yard of a house one house away from Thrifty Food Store she heard him say, “Hey, girl, come here.” [1]
He was a black man she had never seen before. She stopped and he asked her to go to the store and buy him a stamp. She did not remember how much money he gave her.[2] She then went to the store on her bike and purchased a stamp. When she got back to the yard, the man was not there. She knocked on the door and said *1230 she was going to put the money and stamp on a yellow chair which was outside the house.
The man then came to the door with what Rosie testified was a ship made out of something like match sticks. As she was getting on her bike to leave, the man opened the screen door and grabbed her. Rosie yelled at a girl walking down the sidewalk who kept walking.
The man pulled her inside the house and started feeling of her, going down between her legs. He then pulled her into a hallway and into a bedroom. She said the room had a stereo and a lot of shoes and a bed. He pushed her down and told her to take off her clothes. Frightened, she pulled her pants down, and the man pulled them down some more. He unzipped his trousers and “asked me was his penis big.”[3]
She closed her legs and he opened them and laid down upon her. She then testified:
A. He put his penis in my—
Q. Say it loud again, please darling?
A. (Witness was crying) pause — he put — he put his penis — in my pussy.
Q. He put his penis in your pussy. Okay.
A. (Witness crying)
Q. Are you ready to go on?
A. Yes.
She said it hurt her, and when he finished she had “some white stuff between my legs.”
She then testified:
A. He got up and went to the door and looked out the window and I got back up and tried to put on my clothes, he put me down and pulled down my clothes and then he got back on me and then he got back off and when I got up, fixing to put on my clothes, he went to the bathroom and got me a wet towel and he gave it to me and he said, “here, wipe that stuff away between your legs.” I got the towel and I just — I pulled up my pants.
Q. Once that was over with, did he hand you anything?
A. A dollar bill.
Rosie then testified as follows:
A. He unlocked the door and I ran out and got on my bike and I didn’t look both ways before I crossed the street. I just went on across and I fell off my bike as I was trying to go out on the curb—
Q. You need to slow down just a little bit — fell off your bike as you were going over the curb. Then, what happened?
A. I fell off and then I got back on and I turned the corner and went down Delta Street and I went over to my sister-in-law’s house and she had her baby in her hands. I dropped my bike and I ran up to the porch and I grabbed her and she asked me what was wrong. I said a man got on me. She said, “What man?” Then, I said, “The house down the street.” She said, “Where ‘bout down the street.” I was too scared to answer back.
Mrs. Oliver testified she was standing in her doorway when she saw Rosie coming down the street on her bike. Rosie got in the yard, “jumped off her bike,” grabbed Mrs. Oliver and began “hollering — something — some man was messing with her— had messed with her.” She noticed that one button of Rosie’s jeans was buttoned and her panties were in her pocket. Mrs. Oliver said Rosie was scared, and she telephoned the police.
Just after 4:13 p.m. that day Steve Bing-ham, a corporal and investigator with the Greenville Police Department on patrol at Highway 82 and Colorado Street, received a call to go to North Delta Street to investigate a rape case.
In driving to the house on North Delta Street, as Bingham turned right on Alexander Street, he noticed the defendant Clyde Henry Powell about one house distance *1231 from where Powell lived at 1605 Alexander Street “just casually walking at the time.” Bingham had known Powell since junior high school.
Bingham got to Mrs. Oliver’s house and found another officer there talking. He then questioned Rosie and she and — Bing-ham believed Rosie’s sister — got in the car with him.[4] Rosie directed him. Bingham then testified: .
A. When I first arrived at the house, she was a little bit upset. She was being comforted by some of the family members. But, as we were driving — as she was directing me, she was a little bit shaken up but she had stopped her crying and when we got exactly to the house, she said, “that’s it — that’s it.” and I would say in an excited type of voice. I, then, took her back to the house and from that point, the officer took her to DMC [Delta Medical Center].
Q. You took her back to 421 North Delta?
A. Yes, Sir.
Q. Which officer transported her to the Delta Medical Center from there?
A. Officer Joe Johnson, Sir.
Q. I believe Officer Johnson is now with another police department, is that correct?
A. Yes, Sir.
Q. Now, did this end your particular involvement in the case?
A. No, Sir, after she pointed out the house, I went back to the police station and obtained two photos or rather a group of photos of black males, one of which included Clyde Powell. As I stated, I been knowing him — I have known him for several years. We went to school together. I lived down the street from him quite a ways and we would pass his house everyday and it was his older brother that I knew the most. And, I knew that he lived at that location, so I pulled those photographs and put them with other photographs and took them back out to DMC and the victim identified Clyde Powell as the subject that raped her. At that point, I took the photos back and I .came back to the station. About this time, Captain Jennings was in and I turned the information that I had obtained from that point over to him.
Q. All right, Sir. Now, do you recall how many photographs were in this particular series that you showed her?
A. It was six, Sir.
Q. Did she have any hesitation in picking out this picture?
A. No, Sir. She had no hesitation at all.
Mrs. Oliver testified (Vol. II, p.310) that before going to the hospital, Rosie showed the officers the street she had gone down, and it was Alexander Street. Further, she said that Rosie was also asked by the police to point out the house, and without direction she pointed out the house, which was yellow with bricks on it.
Rosie testified she gave the dollar bill which Powell had given her to Mrs. Oliver.
Bingham testified that Rosie described the man as a black male, light skinned, five feet ten inches to six feet in height. Also, he had gerry curls. Bingham was also well acquainted with Robert Powell, Clyde’s brother. In fact, he knew Robert better than Clyde, and at the time he thought (erroneously as it developed) that Robert also lived at 1605 East Alexander. Bing-ham also knew, however, that Robert had a speech impediment, and so he asked Rosie if the man had a speech impediment, “was his voice funny,” and she replied that he did not. This removed Robert as a suspect from Bingham’s mind. And when he went to the police station for photographs, he did not include Robert.
Bingham testified that at the police station and from the files, he "grabbed photographs of Clyde Henry Powell and others that we have in a drawer and put them *1232 together and took them to DMC where the victim identified him.”
Robert C. Jennings, captain with the Greenville Police Department, came on duty at 5:00 p.m. that day, just as Bingham was ending his duty. Bingham relayed his work on the case to Jennings and asked him to continue the investigation. Bing-ham told Jennings that he had talked to Rosie at the hospital, and at her residence. He handed Jennings a group of photographs and told him that when they had completed the medical examination of Rosie at the hospital they were to bring her to the police station for a statement.
Jennings talked to Rosie at the police station and also showed her the photographs Bingham had turned over to him. She selected Powell’s photograph. At that time Rosie also signed her name on the back of the photograph of Powell. She also told Jennings that the house where she had been attacked was the second house from Thrifty Food and was a brick house. She told him she was taken at a point underneath the carport through a side door, pulled inside the house through a kitchen into a hallway and then into a bedroom.[5] The police record showed the complaint was received at 4:13 p.m.
Jennings said Rosie described the man as being a black male with a light complexion and that he had a mustache.[6]
An arrest warrant was issued for Powell, and at 6:00 a.m. on January 19, Kenneth Wayne Jackson and four other policemen went to 1605 East Alexander Street. A woman let them in after they told her their purpose. He testified the officers looked through the house and found Powell, fully clothed, hiding in a bedroom down between the bed and the wall of the house. He said there “wasn’t very much space at all.” Powell was arrested and taken to the police station. When Powell testified in his own behalf, he did not deny this testimony of officer Jackson. He testified he was arrested in his mother’s bedroom.
Rosie’s mother, Mrs. Holmes, testified that her daughter had menstrual periods. A sanitary napkin was in Rosie’s personal effects, and turned over to the police.
Rosie arrived at the emergency room of the medical center at 4:35 p.m. on January 18. She was first seen by Phyliss Jean Wren, a registered nurse who took a statement from her, the interview lasting approximately 45 minutes. She said that Rosie was nervous and shy, and hard to get started, but then told her what had happened. “She would get a little quiet when you got down to the gross detail, but I would keep going and ask her more questions and she was able to complete a full, very detailed, history.”
When the interview was completed, Mrs. Wren assisted a physician in examining Rosie and obtaining specimens. She was given a urinalysis, tested for venereal disease, and swabbed inside her cervix for semen.
Lawrence James Adams, M.D., a pathologist who examined slide and test tube specimens, testified the tests indicated Rosie had had sex within the last 24 hours, probably the last 12 to 24 hours, but it could have been less time. The sperm he examined indicated “some sort of ejaculation.”
Articles of Rosie’s clothing and vaginal smears, washings, and slides were sent to the Federal Bureau of Investigation laboratory in Washington along with samples of Powell’s blood.
Richard E. Reems, body fluids expert, testified Powell was a group “A” secretor. He found traces of semen on several places on Rosie’s jeans and cut out samples from *1233 the jeans indicated a blood group “A” and “H,” the latter indicating a secretor. This was consistent with Powell’s blood. Reems testified that fifteen percent of the population had these two genetic factors.
Head and pubic hair samples of Rosie and Powell were also sent to the FBI laboratory and examined by Wayne Oakes, a fiber specialist. He found no hair fibers similar to Powell’s on Rosie’s clothing. He testified that it was in less than ten percent of the sexual assault cases that hair association would be found.
The dollar bill was examined by the Greenville Police Department for fingerprints with no positive finding.
As above noted a preliminary hearing was held February 6, 1986. The county attorney was ill that day and George T. Kelly, assistant district attorney, represented the State. Rosie testified at the hearing, portions of which testimony have been above noted.
At the direction of the defense attorneys, Powell did not sit in the courtroom, but instead remained in a holding room, also used as the district attorney’s office.
Following the hearing Kelly took Rosie to the door of the room where Powell was and asked her if that was the man. Rosie said that it was.
On September 23, 1986, Powell’s counsel filed a motion to suppress the identification of him following the February 6 preliminary hearing, on the basis that it violated his sixth amendment right to counsel and was also impermissibly suggestive. The motion made no attempt to suppress the photographic identification of Powell by Rosie, although defense counsel were aware even at the February 6 hearing there had been a photographic identification prior to Powell’s arrest.
A circuit judge of the district, not the judge who presided over the trial, heard this motion to suppress. Kelly freely conceded he had taken Rosie to the room where Powell was, and why. He said the door to the room was open, and explained:
Q. And [Rosie], the ten-year-old child, had just finished testifying that she was raped by a black male, correct?
A. She had finished testifying that she was raped by a black male, had further described Mr. Powell, as I recall, perfectly from her description in the preliminary hearing and had previously picked him out of a photographic lineup, but, yes.
Q. Thank you. You did not ask me nor Mr. Webb for permission to bring the ■ ten-year-old to the holding room, did you?
A. No, sir. I would like to elaborate on that, too, just a minute. I hate to keep elaborating, but I think I need to explain these things to the Court and to you. I did this from the stand ... for one reason, and one reason only, and that is that our office has always been and will continue to be interested in Defendants’ rights as well as victims’ rights; and this little girl had described him perfectly, had seen him from a photographic — picked him out of photographic lineup and had seen him prior to this date on numerous occasions. She lived in the neighborhood with him. I was concerned that we were fixing to have a preliminary hearing and have somebody sitting in that jail that was innocent and I didn’t want that, to happen. I did not want that person to be bound over and sit up in the jail for seven or nine — for five or six months waiting on a trial if the was an innocent person. I was interested from the standpoint this was a capital rape case; I was interested from the standpoint that this little girl is approximately the same age as a girl that Clyde Henry Powell had kidnapped as a sixteen-year-old. He was convicted of plucking a man's eyeball out and throwing it on the floor two years before and he ...
BY MR. BASS:
I object to this being unresponsive. This is no explanation; I asked whether or not he asked for permission.
BY THE COURT:
Well, it’s harmless, Mr. Bass.
*1234 A. I was trying to explain why I did what I did, but ...
Q. Well, getting back to my question, Mr. Kelly, ...
BY MR. CARLTON:
I’m not sure he was through. Were you through? I’m not sure.
A. Not quite, not quite. And I felt as though that due to his prior actions and due to the fact that she had given a perfect description of him, that I wanted to make sure that — that in a case of this magnitude that we had the right person. I really thought at that point that the secrecy of the witness, if that’s what it was, because he certainly wasn’t hidden, and the door was open, he was in plain view, that the secrecy need was over. I didn’t see any need for any secrecy at that point; and quite frankly, I was trying to look after your client’s rights as well as my victim’s rights. I’m through.[7]
Kelly, it should also be noted, for the first two and one-half years of his ten-year law practice was public defender in the county.
In the colloquy between the circuit judge and counsel following the suppression hearing, it is apparent that the main thing which troubled the circuit judge was his view there had been a sixth amendment violation in that defense counsel had neither been asked for permission and were not present when Kelly took Rosie to the doorway of the room in which Powell was seated. He never held that this was an “impermissibly suggestive” identification. In pertinent part the order of September 30, 1986, recites:
... the Court hereby finds that the unconstitutional pretrial identification of Defendant by [Rosie] resulting from the illegal showup conducted on February 6, 1986, by Assistant District Attorney George T. Kelly, be suppressed as evidence against Defendant at the trial.... Furthermore, the Court reserves ruling on the admissibility of any in-court identification of Defendant by [Rosie] until it can be determined at Defendant’s trial, through voir dire of [Rosie] out of the presence of the jury, whether such an in-court identification would be the result of said illegal showup or of an independent source of observation.
At trial, prior to her ever testifying before the jury, Rosie’s testimony was given to the court both by direct and cross-examination. Following this the circuit judge ruled that there would be no constitutional infringement upon Powell in permitting Rosie to testify and identify him before the jury.
The circuit judge stated he was satisfied that Rosie had adequate time to observe Powell on the day of the crime and was capable of making an in-court identification, counsel could cross examine her, and the weight and worth of her testimony was for the jury.
Powell’s defense at trial was an alibi. He testified that he, his wife, his mother and his sister lived at 1605 East Alexander on January 18, 1986. His brother Robert Powell did not live with them. He said at 2:00 p.m. he walked to McDonald’s to get something to eat, arriving there at 2:30. While there he talked to a Mr. Knox, and they talked 20-30 minutes. He then went to “Fred’s” to price the dog food, and then to Wal-Mart, arriving there five minutes after 3:00. He said he saw his brother Robert, who was employed there, but Robert did not see him. He was at Wal-Mart 25-30 minutes to be exact, bought some dog food and paper napkins. He left Wal-Mart at 3:45 or ten until 4:00 and walked to Greenville Lumber Company. He got a drink of water there and rested. While there he stayed until ten after 4:00, some *1235 time between 4:00 and 4:30. home between 4:15 and 4:30. He arrived
When Powell was arrested he had given Sergeant R.C. Anderson a statement. On direct examination he said the statement was wrong in saying he went to Wal-Mart first rather than McDonald’s. On cross-examination he said that Anderson put a few things in the statement that he did not say. The statement said Powell had talked to his brother Robert at Wal-Mart, but he said this was in error because he had not. Also left out of the statement was anything about Powell going by Greenville Lumber Company that day. Powell said he told Anderson this, but he left it out. Powell had read and signed the statement he gave Anderson.
Powell also testified on cross-examination that Bingham had seen him between 4:15 and 4:30 that afternoon, and that he was walking to his sister's house.
Powell was born January 19, 1959. His arrest card gave his height as five feet eleven inches, his weight 210 pounds and his complexion light brown. He testified he had two small children, both born out of wedlock, and neither of whom lived with him.
Dianne Powell, his wife, testified that she and Powell’s mother and sister left the house around 2:00 p.m. to go to a carport sale, and returned between 4:00 and 4:30. Nobody was home at the time. Powell’s mother also testified that she had left with her daughter and daughter-in-law around 2:00 p.m., and that she had asked her son to get some dog food and paper towels at Wal-Mart.
Aserey Sanders, employed at Wal-Mart, testified that she had seen Powell between 2:30 and 2:45 that afternoon at the store. Robert Lee Powell, the brother, testified he lived at 340 South Eureka, and was employed at Wal-Mart. He did not see Powell in the store that afternoon. Donnie McHann, warehouse manager at Greenville Lumber Company, testified he had seen Powell at the lumber company between 1:45 and 2:30 that afternoon, and that he had a bag from Wal-Mart or Fred’s. James Franklin Craft, truck driver for the lumber company, testified he had seen Powell that afternoon at their business “between two and four.” He said Powell had a big paper bag from Fred’s or somewhere, and they talked “ten to thirty minutes.”
Defense counsel called Kelly as their last witness and asked him about the identification made of Powell by Rosie on February 6, 1986, and that Powell was the only black man in the room. Kelly was then asked and replied as follows:
Q. Isn’t it a fact that the reason you did that you conducted that one-on-one show was because you, yourself, had doubts about whether or not Clyde was the person that had been identified in this case, so it was really the guilty coverup?
A. Mr. Bass, in all honesty from the beginning of this case, I have never had a doubt the defendant’s identity —never.
(Yol., Ill, p. 546)
LAW
In his assignment of errors Powell contends first that Rosie’s in-court identification of him violated his constitutional rights. He claims the photographs shown Rosie were impermissibly suggestive, and the identification of him by Rosie at the preliminary hearing violated his Constitutional rights. Without these props, he argues, there was no basis for admitting the in-court identification of him at trial.
Powell also contends the verdict of the jury was against the overwhelming weight of the evidence. For the reasons stated, we find no error in either assignment.
We first consider the testimony of Bing-ham. He had known Powell since their boyhood, and Bingham knew he lived at 1605 East Alexander. He saw Powell en route to Mrs. Oliver’s house on North Delta, a fact of little note at that moment. Then, a few minutes later, when Rosie directed him to Powell’s house at 1605 East Alexander and said that was where she had been assaulted, this fact became pregnant with meaning.
*1236 Bingham — erroneously as it developed— thought that Robert Powell lived there as well. He also knew Robert quite well and knew he had a speech impediment. Therefore, when Rosie identified the house, both Robert and Clyde became possible suspects. He asked Rosie, however, if the man who had molested her had a speech impediment, “was his voice funny?” and she said no. That information tended to remove Robert as a suspect. But as to Clyde, not only had Rosie pointed out the house, she gave a description of a man who fit Clyde, a black male, light skinned, five feet ten inches to six feet tall, and who had gerry curls.
When Rosie was taken from Mrs. Oliver’s house to the hospital Bingham drove to the police station, got six photographs of young black males from the files, one of which was Powell and drove to the medical center where he showed them to Rosie. She promptly picked Powell.
Did Rosie’s in-court identification of Powell violate his Constitution rights because the photographic lineup and the preliminary hearing identification were so “im-permissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification”? Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968).
Where the reason for a rule disappears, the rule becomes somewhat irrelevant. What triggers the urgency of applying Simmons, supra, Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); and York v. State, 413 So.2d 1372 (Miss.1982), are occasions when the eyewitness has had a very limited view of the criminal at the time of the crime. Perhaps it was dark, or the perpetrator had on a mask, or the witness saw him only at an angle, or for a brief moment or two, or could only at most identify his voice. Then, without a clear independent recollection of the criminal’s features, the witness is either shown suggestive photographs or the accused under circumstances to suggest to the witness that this was the person the witness saw commit the crime.
When, on the other hand, a reasonably intelligent victim (or eyewitness) has had an opportunity to view and make a good observation of the perpetrator, the method the police used in having the victim (or eyewitness) identify the accused recedes in importance.
The record in this case shows a reasonably intelligent ten-year-old child — she was in the fourth grade in school when she testified at trial and math was her favorite subject — who had the sad experience of having received a detailed and prolonged view of the criminal.
In broad open daylight in the yard at Powell’s house a man stopped her, and told her to go to the store and get a stamp. She returned and saw him in the house, showing her some object which resembled a ship made out of match sticks. He came out of the house and in broad open daylight took her into the house through the carport. There he made her undress, raped her one time, and at least tried to repeat the rape (whether he consummated the second sexual attempt cannot be known). Twice he was on top of the child in daylight hours. She saw him go into the bathroom, get a towel and bring it to her. He gave her a dollar bill.
In less than 45 minutes she had directed Bingham to the house and pointed it out to him, and in less than two hours had identified Powell from six photographs.[8]
If this child needed, any kind of prompting to identify Powell after all this exposure, one would have to wonder why. The test of Biggers, supra, is as follows:
... the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness degree of attention, the accuracy of the witness’ prior de- *1237 seription of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. [Emphasis added]
409 U.S. at 199, 93 S.Ct. at 382, 34 L.Ed.2d at 411.
It is apparent from this record that Rosie was a sensible child, who had all kinds of opportunity to view the rapist in daylight, and if her attention was not riveted to him, again one would have to wonder why. She gave a description of Powell to Bingham, the accuracy of which is undisputed, she identified his photograph without hesitation, and this at most was no more than an hour and a half after the crime.
From the “totality of the circumstances” did she pass the Neil v. Biggers test justifying admissibility of her in court identification? Clearly she did.
Moreover, she had directed Bingham to the house where she was raped, and only one man lived there: Powell. Even if she had been confused in her description, or hesitant in identifying Powell from photographs, the fact that she was positive it happened in Powell’s house would have been damning evidence.
When thus examined, it can be seen that the argument that Rosie’s in-court identification of Powell resulted from either the photographs or seeing him on February 6, 1986, or both, is without merit.
When a reasonably intelligent eyewitness has had a good opportunity to view the features of the perpetrator of a crime, the method the police use in having the witness identify the defendant recedes in importance in inverse ratio to the intelligence of the witness and opportunity to view the perpetrator.
This is the teaching of Neil v. Biggers, supra, and Manson v. Brathwaite, supra. Neil v. Biggers gave the test, as above set forth, and it also gave the answer. In that case the victim had been grabbed in the doorway of her kitchen, in which there was no light, by a youth with a butcher knife. The light by which she saw him came from the bedroom. At knifepoint he took her about two blocks along a railroad track and raped her. The light by which she saw him was a full moonlight. She generally identified him to police as 16 to 18 years old, five feet ten inches to six feet tall, weighing between 180 and 200 pounds, and having a dark brown complexion. She was shown between 30 and 40 photographs, attended lineups, but never identified any person. Seven months later two detectives brought the defendant to her, and had him say, “shut up or I’ll kill you.” She then identified him.
The United States district court had held that the impermissibly suggestive method of identification required that the evidence be excluded. The United States Supreme Court agreed the method of identification was impermissibly suggestive. The Court then continued:
We turn, then, to the central question, whether under the “totality of the circumstances” the identification was reliable even though the confrontation procedure was impermissibly suggestive.
409 U.S. at 199, 93 S.Ct. at 382, 34 L.Ed.2d at 411.
The victim spent a considerable period of time with her assailant, up to half an hour. She was with him under adequate artifical [sic] light in her house and under a full moon outdoors, and at least twice, once in the house and later in the woods, faced him directly and intimately. She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes. Her description to the police, which included the assailant’s approximate age, height, weight, complexion, skin texture, build, and voice, might not have satisfied Proust but was more than ordinarily thorough. She had “no doubt” that respondent was the person who raped her. In the nature of the crime, there are rarely witnesses to a rape other than the victim, who often has a limited opportunity of observation. The victim here, a practical nurse by profession, had an unusual opportunity to observe and identify her assailant. ...
******
*1238 Weighing all the factors, we find no substantial likelihood of misidentifieation. The evidence was properly allowed to go to the jury. [Footnotes omitted]
409 U.S. at 200-201, 93 S.Ct. at 383, 34 L.Ed.2d at 412.
In Manson v. Brathwaite, supra, a police officer at 7:45 p.m. eastern daylight time purchased heroin from a vendor in an apartment building. The light came from a window in the third floor hallway. The vendor opened the door 12-18 inches and the officer asked for “two things” of narcotics. The vendor held out his hand and the officer gave him two $10 bills. Soon the vendor returned, opened the door and handed the officer two glassine bags. The officer had about two minutes at most to observe. The officer, Glover, described the man as a “colored man, approximately five feet eleven inches tall, dark complexion, black hair, short Afro style, and having high cheekbones and of heavy build.”
Two days later the officer was shown a single photograph of the defendant and identified him.
There was no denial the method of identification was suggestive. Yet the Court held the trial court identification of the defendant by the officer was proper. Using the test of Neil v. Biggers, supra, the Court noted Glover had two to three minutes to view the defendant near sunset, as an officer he was trained to observe people, the description he gave was accurate, and he was certain the photograph was the defendant. Finally, the lapse between the observation of the vendor and seeing the photograph was two days.
The Court observed: “These indicators of Glover's ability to make an accurate identification are hardly outweighed by the corrupting effect of the challenged identification itself.” 432 U.S. at 116, 97 S.Ct. at 2254, 53 L.Ed.2d at 155. “Reliability is the linchpin in determining the admissibility of identification testimony.” 432 U.S. at 114, 97 U.S. at 2253, 53 L.Ed.2d at 154.
It should also be noted that the Court saw some significance in the fact that the defendant, although he did not live in the apartment where the heroin was sold, was later arrested there. Compare that with this case, Powell lived at 1605 East Alexander. He was the only male who lived there.
In this record the Neil v. Biggers, supra, test is better met than in either Neil v. Biggers, or Manson v. Brathwaite. True, in these cases the eyewitnesses were adult, but neither had anything like the opportunity to view the criminal that Rosie had. Neither gave any better description of the perpetrator than Rosie did.
In York v. State, 413 So.2d 1372 (Miss.1982), the victim saw the robber two to three minutes, but could give no description. Her reason, “she could never forget these eyes,” and some boots he was wearing; in Ray v. State, 503 So.2d 222 (Miss.1986), the victim saw the robber approximately a minute, and no description was given; and in Arteigapiloto v. State, 496 So.2d 681 (Miss.1986), in which victim identified the defendant from six photographs six months after the robbery. In all of these we held the in-court identification was proper.
PHOTOGRAPHS NOT IMPERMISSIBLY SUGGESTIVE
Moreover, there was no proof offered or attempted claiming that the photographic identification was impermissibly suggestive. The record contains no photograph of Powell taken at the time of his arrest. The date of the photograph shown Rosie was May 4, 1983. She testified he had a mustache and a gerry curl. The photograph shows a mustache, long sideburns, but apparently no gerry curl. Bing-ham simply took six photographs of young black males and showed them to Rosie. There is no proof whatever that he attempted to influence Rosie in selecting the photograph of Powell.
The issue is raised for the first time on appeal. Defense counsel were in the best position to argue and present evidence during trial proceedings that the photographs were suggestive. If they were, and if defense counsel thought they were, they should have moved to suppress this identi *1239 fication along with the February 6, 1986, identification following the preliminary hearing.
The motion to suppress pretrial identification filed on September 22, 1986, makes no mention of the photographs being suggestive. It is a three-page motion, followed by a lengthy brief. Although the defense counsel knew at the preliminary hearing that Powell had been identified by Rosie by photograph, they apparently saw nothing amiss.
The hearing before the circuit judge on September 26,1986, was a lengthy hearing, but the sole basis of any objection to identification of Rosie of Powell in the holding room (district attorney’s office) on February 6, 1986. In his argument the defense counsel made no objection to the photographic identification. (Yol. I, p. 194)
Indeed, at trial it was defense counsel who questioned Bingham and Jennings at length about the photographs, and it was defense counsel who wanted to introduce them into evidence, without objection by the State. In his cross-examination of the officers about the photographs, defense counsel never once intimated they were “suggestive.” (Vol. II, p. 361)
No claim whatever was made by defense counsel either prior to trial or at trial that these photographs were impermissibly suggestive.
If Powell’s photograph compared with the others was impermissibly suggestive, it must be a conclusion reached by this Court on its own, unaided by any trial court testimony. There is no photograph in this record taken at the time of Powell’s arrest. How can this Court say a photograph taken almost three years before the crime was impermissibly suggestive?
The issue of whether the circuit judge erred in ruling the courthouse identification of Powell was improper is not before us, and need not be addressed.
Manifestly Rosie’s in-court identification of Powell was constitutionally proper, and its credibility a jury question.
SUFFICIENCY OF THE EVIDENCE
The record in this case is quite clean. Although Powell had an unsavory criminal record, one time of kidnapping a female and another time a conviction of aggravated assault, none of this was put before the jury. No attempt was made to elicit from Mrs. Oliver or Mrs. Wren hearsay testimony of Rosie’s describing the rape to them. Rosie was seen and assisted by a guidance counselor, but this lady did not testify.
We have at some length set forth the facts shown by the record in this case which clearly made a jury issue on the identification of Powell by Rosie. She made an intelligent witness. Counsel with commendable vigor argued the weakness of the State’s case. We also note that counsel argued strenuously for the circuit court to exclude as a matter of law any consideration by the jury of the death penalty, not because of the weakness of the State’s case, but instead alleging it would have been a violation of the 8th Amendment. Counsel also sought without success for a writ of prohibition from this Court directed to the trial court to prevent that court submitting any sentencing hearing to a jury on whether Powell should be sentenced to life imprisonment or death.
There is clearly sufficient credible evidence upon which the jury could find Powell guilty of this crime.
The remaining assignment of error by Powell that there was a violation of Miss. Code Ann. § 99-17-1, the 270-day statute, is clearly without merit, and there is no need to address it.
AFFIRMED.
ROY NOBLE LEE, C.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and BLASS, JJ., concur.
DAN M. LEE, P.J., concurs in result only.
PITTMAN, J., not participating.

. At the preliminary hearing on February 6, 1986, she testified he said, “Come here, little girl.”

. At the preliminary hearing, Rosie had testified he gave her some change, and she paid 22e for the stamp at Thrifty Food Market. She also said it was a Chinese store.

. At the preliminary hearing, Rosie testified he said, “Ain’t my thing big?”

. It was actually Mrs. Oliver who got in the car with Bingham and Rosie.

. At the preliminary hearing, Jennings, who was familiar with the house, testified that the side door was the method of entry. He did not even know if the front door was ever used or not. And, her description of the interior rooms’ location “was the layout of that particular house."

. At trial Jennings, on cross-examination, testified that Rosie had told him Powell had gerry curls. Upon re-direct examination he reviewed the statement and did not see where she had told him that Powell had gerry curls. However, at the preliminary hearing on February 6, 1986, Rosie testified Powell had a mustache and a short gerry curl. She also testified at the hearing that he was about 28 years old and tall. When asked whether he was fat or thin, she replied, "thin."

. Kelly’s statements that Rosie had seen Powell “prior to this date on numerous occasions,” and that "she lived in the same neighborhood with him,” are not supported in the record. Rosie testified she had never seen Powell prior to January 18, 1986, and there is nothing in the record to indicate she saw him at any time following January 18 until she saw him in the anteroom following the preliminary hearing on February 6, 1986. The only record evidence as to the location of their respective homes is the street addresses given. Whether these addresses are in the “same neighborhood" was never developed.

. At the preliminary hearing Rosie was asked approximately how many photographs were shown her, and she said, "Five, I think.”