575 So.2d 16 (1990)
Frank MACKBEE a/k/a Frankie Lee Mackbee
v.
STATE of Mississippi.
No. 03-DP-0089.
Supreme Court of Mississippi.
December 27, 1990.
*18 Robert O. Allen, Allen Allen & Boutwell, Brookhaven, Dennis L. Horn, Horn & Payne, Jackson, for appellant.
Mike Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, Dunn O. Lampton, Dist. Atty., Magnolia, for appellee.
EN BANC:
ANDERSON, Justice, for the Court:
On September 5, 1986, Frank Mackbee was indicted by the Lincoln County grand jury for the capital murder of Cicero Montgomery, with an underlying felony of robbery, under Miss. Code Ann. §§ 97-3-19(2)(e) (Supp. 1990). Mackbee was also indicted as an habitual offender under Miss. Code Ann. § 99-19-83 (Supp. 1990). Thereafter, upon change of venue, the cause was tried in the Covington County Circuit Court. The jury returned a verdict of guilty as charged, and at the sentencing phase, the same jury returned a sentence of death.
Aggrieved by the judgment and sentence, Mackbee perfected this appeal and assigned numerous issues of error. We have reviewed the extensive record, the issues Mackbee raised in this appeal, the briefs and the law, and we conclude that his conviction must be affirmed. His death sentence, however, is reversed and a new sentencing hearing must be conducted.

I.
During the afternoon of April 2, 1986, as they were driving along Highway 42, at least three individuals saw a man at a brown Mercury automobile that was smoking. One of the individuals, Billy Drennan, on his way home from work stopped and offered assistance to the man, who was attempting to put out the fire. This man was later identified as the defendant, Frank Mackbee. Drennan gave Mackbee a fire extinguisher, but he never used it. It appeared that the only thing wrong with the car was a "busted" radiator hose.
While Drennan was with Mackbee, a second passerby came along. This driver, David Skaggs, also offered his assistance to Mackbee. Skaggs, however, only remained with Mackbee and Drennan for approximately three to four minutes. Drennan then decided to leave as Mackbee determined that he simply would allow the car to cool down.
A third passerby, Ricky Murchison, saw Mackbee at the smoking car, and although he slowed down, he did not offer his assistance. On his return from the store some fifteen minutes later, however, Murchison stopped and looked into the car. He realized the hood and interior of car were burning. No one else was at the scene at this time until Janice Lott arrived. Drennan, Skaggs and Murchison identified the "nervous", six-foot tall 170-pound black male, dressed in a white shirt and dark pants as Frank Mackbee.
Some time later, firemen from the Rawls Springs Fire Department extinguished the car blaze. Deputy Howell Stephens of the Forest County Sheriff's Department was also dispatched to the scene of a burning vehicle. He arrived at the vehicle between 8:00 and 8:30 p.m. The car was located two miles north of Highway 42 and approximately six miles from Hattiesburg in Forrest County. After arriving Stephens ran a National Crime Information Center (NCIC) check on the car's license plate. As a result of this check, he discovered the owner of the car was 77 year-old Cicero Montgomery, a resident of Brookhaven, Mississippi. Brookhaven, located in Lincoln *19 County, is approximately sixty miles from the scene of the burning vehicle.
Continuing his investigation, Stephens talked to Janice Lott, who was near the scene of the burning car. She gave him a description of an individual she saw near the car earlier. Lott did not testify at trial. It, however, was unclear whether she was the individual who called the fire department or her neighbor, who was also at the scene called. Lott found Montgomery's driver's license and other scraps of paper in close proximity to the scene, and she gave them to the authorities.
While conducting an initial investigation, Stephens opened the car's trunk with a screw driver to determine if the fire had been extinguished. When he opened the trunk, he discovered "one badly charred body." He immediately closed the trunk and called for investigators.
Four investigators, Joe Hopstein, Raymond Howell, Ken Ritchey and Mike Hilton, arrived on the scene, and Stephens continued to assist in the investigation. During this investigation, the officers determined that there were two charred bodies in the trunk. The bodies were later identified as Cicero Montgomery and Leon David Tyler. Montgomery's body was lying on top of Tyler's. It was later determined that Mackbee, Montgomery and Tyler lived in the same community in Lincoln County, and they were related to each other.
Meanwhile in Lincoln County, Garry Austin, then Mississippi Highway Patrol Criminal Investigator, was requested to assist in the investigation by Lincoln County Sheriff George Earls. Austin proceeded to the Highway Patrol substation in Brookhaven and met with Sheriff Earls and two Forrest County deputies, Mike Hilton and Ken Ritchey. Austin testified that at this time he was aware that Montgomery's vehicle had been found burned in Forrest County and that two bodies were in the trunk. The men assumed that one of the bodies was that of Montgomery. Austin also was aware that Leon Tyler had been reported as missing to the Lincoln County Sheriff's Department by his mother. The transcript does not indicate at what time Austin was dispatched to the scene in relation to his learning of Tyler's missing person report. At the preliminary hearing, however, Austin testified that he first talked to Tyler's mother at approximately 1:20 a.m. on April 3, 1986.
Austin and the other officers went to Montgomery's home, which was located in a rural area approximately eight (8) miles east of Brookhaven. The men observed that the house was in disarray  blood was on the dining room table, the kitchen floor and under the carport, fired shotgun shells were located in the same area as the blood and the dining room table was broken down the middle. All of the windows were closed, but a screen was missing from one window on the west side of the house.
Several shoe prints were located outside the house in a turnaround area (thirty to forty feet from the carport), the driveway, and an area approaching the carport. The shoe prints appeared to be of "a shoe with a gum-type, soft-type sole" but thick sole, and a distinguishing tap on the heel. (Vol. IV. T. 462). The officers backtracked the prints starting at Montgomery's home to Mackbee's parents' residence. The same shoe prints were left approximately one-hundred yards from Montgomery's home at a mailbox of his neighbor's house. On cross-examination Austin revealed that they lost contact of the shoe prints somewhere between Montgomery's and Mackbee's parents' home. Ken Ritchey, Chief Investigator, testified and corroborated Austin's testimony.
The trial transcript does not indicate at what point in the investigation Austin began to suspect Mackbee, who lived approximately one-half mile from Montgomery. During the preliminary hearing though, Austin testified that the disarray at Montgomery's house indicated that a crime had occurred. He was familiar with Mackbee's past criminal history of robbery and burglary, all of which happened in the immediate area where Mackbee lived. Austin talked to Mackbee's parents who reported they had not seen him since 9:00 a.m. on April 2, 1986. Mackbee's mother informed *20 Austin that when he left home Mackbee was wearing jeans, a plaid shirt, and suede shoes with a design. She also gave the officer Mackbee's approximate weight and height and his age. Through subsequent investigation, Austin determined that Mackbee was on parole.
Returning to Forrest county, a taxi driver picked up a male he identified as Mackbee approximately six miles north of Hattiesburg at approximately 6:42 p.m. on April 2. The same taxi driver picked up Mackbee again about 8:00 p.m. and drove him to Dabbs Street in Hattiesburg.
Law enforcement officials began looking for a taxi passenger, and they gave the dispatcher a description of Mackbee. The dispatcher, in turn, relayed this description to his drivers. The driver told the dispatcher that one of his passengers fit the description. Later at 3:00 a.m. on April 3, 1986, the dispatcher received a call for a fare from a man whose voice sounded like the earlier caller asking to be picked up on Dabbs Street. The police followed the taxi cab to within three hundred yards of the telephone booth, but did not see Mackbee.
Meanwhile, another cab company driver, Billy Holmes had picked up a male he identified as Mackbee at approximately 2:00 a.m. on Highway 49 and delivered him to the corner of Dabbs and Ruby Avenue.[1] When law enforcement officials learned of Holmes' fare to Dabbs Street, they asked Holmes to talk to them and to drive back down Dabbs Street. Holmes responded and saw Mackbee walking on Dabbs Street. This information was radioed to the police who pursued Mackbee to the private residence where he was arrested at approximately 3:00 a.m. for trespassing.
The investigation continued. When he was arrested, the officers confiscated Mackbee's clothes. A forensic serologist determined that he found type-O human blood on Mackbee's clothes. A small amount of blood was also found on Mackbee's right shoe; however, there was not enough blood to determine its type. Montgomery and Mackbee each had type-O blood.
A forensic scientist, Frank McCann, testified that he determined that Montgomery's clothes had accelerants on them. He was unable to determine where the fire had started, but he opined that it was started with an accelerant. In addition, because of the amount of soot present in the trunk and on Montgomery's clothes, McCann postulated that there was a smoldering fire in the trunk. The fact that the trunk did not explode indicated to McCann that the accelerants on the bodies did not come from the gas tank.
McCann also examined the shoe prints and tire tread evidence found at the scene. He determined that the shoe prints were made by Mackbee's shoes. He indicated that there were numerous individual characteristics of the shoes. According to McCann, "[o]ne of the outstanding characteristics [was] ... th[e] rubber sole protector on the back of the shoe, but there [were] also many other nicks and cuts and worn spots which [they] were able to identify and match back up with the impression on the scene." (Vol. VI, T. 838).
Another forensic scientist, Deborah Haller, testified that she accompanied Julia Jones, a crime scene specialist, to Montgomery's home to collect physical evidence. While there they collected blood samples from the kitchen, dining room floor, dining room table, the driveway and under the carport. They also discovered shoe prints at the neighbor's mailbox, but she did not find anything distinguishing about them. They also lifted latent fingerprints from the driveway area and from the inside of Montgomery's home; however, none of these prints matched Mackbee's fingerprints. In addition, they found several used .20 gauge shotgun shells, but they did not find a gun.
On April 3, 1986, the morning after discovering the bodies, Stephens returned to the scene in Forrest County and found shoe prints made from a rubber sole with a metal tap on the heel. During his investigation, *21 Stephens found Montgomery's billfold approximately fifty to seventy-five feet off the blacktop on a hill where the other items of the victims were discovered. The shoe prints were approximately twenty feet from where the paper and billfold were located.
Mackbee was indicted in separate indictments for the capital murder of Montgomery and Tyler. The case at bar is an appeal from the conviction and sentence for the capital murder of Cicero Montgomery with an underlying crime of robbery of Montgomery's car. At the time of trial, Mackbee had not been tried for the capital murder of Tyler. There was no eye-witness testimony to the events which transpired on April 2, 1986 at the Montgomery home. Mackbee did not testify at trial, nor did he make a statement to the police prior to trial.[2]
We now turn to the assignment of errors that Mackbee raises in this appeal.

GUILT PHASE

I.

WHETHER THE CIRCUIT COURT ERRED IN FAILING TO GIVE THE PROPOSED DEFENSE INSTRUCTIONS ON THE LESSER INCLUDED DEFENSE OF MANSLAUGHTER
The prosecution presented a story which involved burglary, robbery and murder. According to the state's evidence, Mackbee was seen in the area of Montgomery's home before noon on April 2, 1986. This was not an unusual occurrence because he lived in the same neighborhood as Montgomery. Lizzie Tyler testified that she saw Montgomery in his car in the neighborhood between 11:00 a.m. and 1:00 p.m. He was returning home from Brookhaven where he bought seed and fertilizer to plant his garden. Her son, Leon Tyler, a twenty-nine year old mentally retarded neighbor and a cousin of Mackbee and Montgomery, left his home at approximately 3:00 that afternoon to help Montgomery finish planting his garden. (Vol. V., T. 660).
After Leon failed to return home, his mother went down near Montgomery's home at approximately 5:30 p.m. As she approached she only saw the bicycle that Leon rode down to Montgomery's home. She did not see Montgomery's car. She returned to Montgomery's home at around 7:30 or 8:00 that night, but she still did not see anything but the bicycle. After going to Montgomery's once again between 10:30 and 11:00, she still did not see anything but the bicycle. Having become suspicious and apprehensive, Mrs. Tyler returned home and called the law enforcement officials.
After meeting with the Sheriff and two Forrest County Deputies, Garry Austin of the Mississippi Highway Patrol went to Montgomery's residence.[3] When they arrived they discovered several shoe prints in the area. When they went inside Montgomery's home, they saw that the furniture was in total disarray. The dining table in the dining room was broken through the middle, and there was blood on it. There was blood on a plate which was on the table. (Vol. IV. T. 435).
As the officers went outside the house, they saw more blood on the carport, and they found fired shotgun shell. (Vol. V, T. 605-07). As they continued to investigate, they observed that a screen was missing from one of the windows of the house. In examining the footprints that were located near the home, the officers "followed [the] footprints, started from the Montgomery residence, and ... backtrailed the shoe prints, the shoe prints that [they] thought were headed toward the Montgomery residence, back to the Mackbee residence." (Vol. IV, T. 467).
Upon this evidence as well as other evidence the state argued that Mackbee broke into Montgomery's home. He was in Montgomery's home when Montgomery returned from Brookhaven. While Montgomery *22 was taking off his shoes and putting on those that he wore when working in his garden, Mackbee approached him from behind and "hit him in the back of the head with a blow that [was] so hard ... that it cut, ripped a gash in the back of [Montgomery's] head..." (Vol. VI, T. 977). The disarray in the home reflected the violence, and the fact that Montgomery's body and wallet were found in Forrest County indicated that there had been a robbery. Furthermore, Montgomery did not die from the blow to the head, but he died from asphyxiation after he was placed in the trunk of his car and an accelerant poured over his body and ignited.
Testimony presented by the medical examiner indicated that when she examined Montgomery's body, it was charred, and it smelled of accelerant residues. Also while examining Montgomery's body, the examiners observed a laceration, which measured approximately one inch, in the back of his head. They also found a hemorrhage to the brain, and soot in Montgomery's trachea.
A second medical examiner, who also took part in the autopsy testified that the laceration in Montgomery's head was the result of a blow to the head by a blunt object. (Vol. IV, T. 577). The striking finding, according to this witness, "was that the lining of the airway all the way from the nose and the mouth into the lungs was covered with soot, fine particles of what is produced by smoke. The airway was lined all the way down into the lungs with soot." Id. This indicated to the medical examiners that Montgomery was alive at the time of the fire and "that he had breathed the smoke into his lungs, all the way into his lungs down into his small airways." (Vol. IV., T. 578). Therefore, the blow to the head that he suffered only damaged his brain and "was not enough to have killed [him]. It could have knocked him unconscious ..." (Vol. IV. T. 582).
In his first assignment, Mackbee argues that the trial court erred in refusing to grant his instruction on the lesser included offense of manslaughter. The indictment for Mackbee's crime read in part:
... that Frank Mackbee, ... did willfully, unlawfully, feloniously and of his malice aforethought kill and murder one Cicero Montgomery, a human being at a time when he, ... was then and there engaged in the commission of the crime of robbery of the said Cicero Montgomery, contrary to and in violation of Section 97-3-19(2)(e) of the Mississippi Code of 1972, ...
(Vol. I, T. I, 3). MISS. CODE ANN. § 97-3-27 (1972), on the other hand, provides that:
[t]he killing of a human being without malice, by the act, procurement, or culpable negligence of another, while such other is engaged in the penetration of any felony, except rape burglary, arson, or robbery, or while such other is attempting to commit any felony besides such as are above enumerated and excepted, shall be manslaughter.

DISCUSSION OF THE LAW
Our law on granting instructions on lesser included offenses is clear. Trial judges should be mindful of the disparity in the maximum punishments between the lesser included offense and the crime charged. See Boyd v. State, 557 So.2d 1178, 1181 (Miss. 1989); Griffin v. State, 533 So.2d 444, 447 (Miss. 1988). Even where there is a great disparity in punishments, however, the trial court can not indiscriminately give a lesser-included offense instruction. Boyd, 557 So.2d at 1181. A defendant is only entitled to an instruction when there is evidence in the record which reflects the need for the instruction. Mease v. State, 539 So.2d 1324, 1329-30 (Miss. 1989); cf. Swanier v. State, 473 So.2d 180, 188 (Miss. 1985) ("where the evidence does not warrant a manslaughter instruction, one should not be given").
We have detailed in several of our cases the evidentiary basis for giving of lesser included instructions. See, e.g., Ruffin v. State, 444 So.2d 839, 840 (Miss. 1984); Harper v. State, 478 So.2d 1017, 1021 (Miss. 1985); Fairchild v. State, 459 So.2d 793, 801 (Miss. 1984); Rowland v. State, 531 So.2d 627, 631 (Miss. 1988); see also Mease, *23 539 So.2d at 1330; and Boyd, 557 So.2d at 1182. Simply put, this court has stated, "`the evidence in a particular case generally warrants granting a lesser offense instruction if a `rational' or a reasonable jury could find the defendant not guilty of the principal offense charged in the indictment yet guilty of the lesser-included offense.'" Mease, 539 So.2d at 1330 (quoting Monroe v. State, 515 So.2d 860, 863 (Miss. 1987)). Furthermore, "[o]nly where the evidence could only justify a conviction of the principal charge should a lesser offense instruction be refused." Mease, 539 So.2d at 1330. To sum up the point, "a lesser included offense instruction must be granted where a reasonable juror could not on the evidence exclude the lesser-included offense beyond a reasonable doubt." Boyd, 557 So.2d at 1182 (emphasis in original) (citation omitted).
In Boyd this Court further emphasized that:
[t]he jury may consider any evidence presented at trial. It is not limited to the testimony of the defendant ... Moreover, `[n]either the trial court nor this Court should ask which way the evidence preponderates  [the greater or lesser offense] ... Likewise, neither the trial court nor this Court can' merely ask if there is sufficient evidence to sustain the jury's verdict of guilty of [the greater offense]. The answer to that question in this and other cases may be `yes' and there still be reversible error in not giving the lesser included instruction.
Id.
In Mease we reiterated that these same standards apply in prosecutions brought under this state's capital murder statute. Today, we also reaffirm our increased constitutional duty where the state seeks the death penalty. We again state that "`in a capital murder case ... all doubts should be resolved in favor of the accused.'" 539 So.2d at 1330, quoting Fairchild, 459 So.2d at 801; Gambrell v. State, 92 Miss. 728, 736, 46 So. 138, 139 (1908).
As we turn to the case sub judice, we note that there are no doubts. There was no evidence to support a manslaughter instruction.[4] Mackbee exclusively relies on the evidence offered by the state to support his request for a manslaughter instruction. But cf. Mease, 539 So.2d at 1334 ("The defense labored mightily at trial toward establishing the principal element of manslaughter  the absence of legal malice ..."). This evidence, however, only supports a conviction of the greater offense. We can not say that Mackbee did not have the malice aforethought to commit his crime. The evidence indicates that there was a struggle in Montgomery's home. Moreover, Mackbee subdued Montgomery by hitting him with a blunt object and with tremendous force and knocked him unconscious. He did not end there, but he put Montgomery's unconscious, albeit, live body into the trunk of Montgomery's car and drove the car to another county. It was there, after hours to deliberate and to consider what he was doing, that Mackbee poured gasoline on Montgomery and burned him to death.
Based on these facts the trial court properly denied his request for a jury instruction on the lesser included offense of manslaughter. Mackbee's first assignment is rejected.

II.

WHETHER INTRODUCTION OF TESTIMONY, PHOTOGRAPHS, VICTIM-IMPACT EVIDENCE AND ARGUMENT OF AN ALLEGED SECOND CRIME OF MURDER VIOLATED FRANK MACKBEE'S RIGHTS UNDER BOTH STATE LAW AND MISSISSIPPI CONSTITUTION, AND THE EIGHTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
The due process clauses of the Mississippi Constitution and of the federal constitution require that a trial be conducted according to established procedures with an adequate opportunity to be heard in defense. *24 The Mississippi Constitution commands that "[n]o person shall be deprived of life, liberty, or property except by due process of law." Art. 3 § 14 Miss. Const. See also U.S. Const.Am. XIV.
In criminal procedures, due process requires, among other things, that a criminal prosecution be conducted according to established criminal procedures. To establish those procedures this Court has promulgated the Mississippi Rules of Evidence to guide the admission of relevant evidence. Miss.R.Evid. 401, 402. However, even relevant evidence may not be admissible "if its probative value is substantially outweighed by the danger of unfair prejudice". Miss. R.Evid. 403. One area in which relevant evidence may be excluded is in the admission of evidence of other crimes, wrongs or acts. Miss.R.Evid. 404(b). However, an exception to the inadmissibility of evidence of other crimes when the purpose of admission is for the purpose of establishing motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Miss.R.Evid. 404(b).
This recitation of the rules lays the background of the arguments of the defendant and the State as to this assignment of error. The defendant asserts that, even though he was being tried for the single murder of Cicero Montgomery, the State interjected the facts of the murder of David Leon Tyler. David Leon Tyler died from shotgun wounds, while Cicero Montgomery received a blow to the head and died of smoke inhalation. To preclude the introduction of evidence relating to Tyler, defense counsel made a motion in limine to exclude the evidence of the Tyler murder, which motion was overruled. (Vol. IV, T. 409-413). The trial court's ruling was based upon the fact that the events of the common scheme or plan was so intertwined that they could properly be submitted to the jury.
Defense counsel noted in the motion in limine that:
The evidence in this case, and the makeup of this case, is such that the District Attorney can try his capital murder case against the defendant concerning Cicero Montgomery without ever mentioning the death of Mr. Tyler. Mr. Tyler apparently died from shotgun wounds whereas Mr. Montgomery apparently received a blow to the head and died from some kind of smoke inhalation. Introducing evidence of some other crimes, and especially this other alleged killing or death, in Montgomery's case, again, would be irrelevant, prejudicial and violate due process of law.
Id. at 410-411. The trial judge overruled the Motion in Limine holding that the events of these two murders were events of a common scheme or plan and were so intertwined that evidence of both crimes could properly be submitted to the jury. Id. at 409-413. The defense counsel asked and received from the trial judge a continuing objection to the admissibility of this evidence throughout the trial. Id. at 412, 413. This reservation preserves this alleged error for our review on appeal.
There were repeated occurrences of the introduction of the evidence of both murders. Prominently displayed were photographs of the two bodies, introduced over defendant's objection. Id. at (Vol. IV, T. 492, 494, 509).
During his opening statement, the prosecutor noted that two (2) bodies were found at the scene of the crime. Id. at 418. "[A]nd they also discovered that another person was missing. A Mrs. Tyler had called the Sheriff's Department and said that her son was missing ..." (Vol. IV., T. 420). This occurred again during trial. (Vol. V., T. 591).
Garry Austin, then Criminal Investigator, Mississippi Highway Patrol testified:
Q: What were you aware of at that time? [When dispatched to the scene of the crime.]
A: That Mr. Montgomery's vehicle had been found in Forrest County burned, and upon examination deputies had found two human bodies in the trunk of the vehicle.
Q: At that time was any positive identification made as to the identity of the two bodies in the trunk?
* * * * * *

*25 Q: And at that time were you aware if anyone else had been reported as missing?
A: Leon Tyler had been reported as missing by his mother to the Lincoln County Sheriff's Department.
(Vol. IV, T. 434).
Howell Stephens, Criminal Deputy Forrest County Sheriff's Department, testified:
Q: After they arrived on the scene was the trunk examined more closely?
A: Yes, after they arrived we raised the trunk and determined that there were two bodies 
BY MR. ALLEN: Your Honor, I would like to interpose an objection ...
BY THE COURT: Well, ladies and gentlemen of the jury, we are now trying this case concerning the death of Cicero Montgomery's only and the robbery of Cicero Montgomery only, and no other person. So if it's necessary to present other evidence in order to show with reference to this case, then it may be done; otherwise, it would not be relevant. All right.
(Vol. IV. 490) (emphasis added).
With regard to the pictures being introduced during Stephens' testimony, Mackbee objected and made an oral argument out of the presence of the jury. The court ruled:
Well I think the pictures have probative value that far outweighs any prejudicial effect. They are perhaps to some extent gruesome, but they are, as I understand it, that's the scene the witness saw when the trunk was opened; is that correct?
BY STEPHENS: Yes, sir.
BY THE COURT: All right.
BY MR. ALLEN: Your Honor, I don't think there's any question whether or not the body was found in the trunk, it's not an element of the crime, and it obviously is being offered to a jury composed of twelve women for no other reason than to show exactly what it shows, and especially the fact that the intestines sticking out are those of someone we're not even trying here.
(Vol. IV. T. 493).
Patricia Eddins, State Medical Examiner's Office, testified about her observations during Montgomery's autopsy:
Q: [D]id another body accompany that body of Cicero Montgomery?
BY MR. ALLEN: Your Honor, for the sake of the record so I don't have to keep interrupting, if I could have a continuing objection to this line of testimony, to any talk about a second body.
BY THE COURT: Well, I am going to permit the State to go into this evidence on a limited scale insofar as to show what, if any, the condition was in which the body of Cicero Montgomery was found.
* * * * * *
Q: [C]an you identify what is shown in that photograph, M-86 200?
A: Yes, sir, this is the body that we autopsied directly following the body of [Montgomery] and, to my knowledge, both of these bodies were transported at the same time to us.
(Vol. IV. 569-570).
Carl Swan, Rawls Springs Volunteer Fire Department, responded first to the scene of the burning car. He testified as follows:
Q: Were you present when the trunk was opened?
A: Yes, sir.
Q: And what, if anything, did you see inside the trunk?
A: There were two bodies discovered inside the trunk.
(Vol. IV, 590-591).
Finally, Lizzie N. Tyler, mother of the second victim, testified in pertinent part as follows:
* * * * * *
Q: Would you tell the ladies of the jury where you saw him [Mackbee] and about what time you saw him.
A: Well, I really don't know what time it was, ..., but I know it was in the morning, and he wasn't too far from *26 where I stayed at going down towards his house.
Q: Who was he with at that time?
A: That's when he got in the car with his uncle.
(Vol. IV., T. 658).
* * * * * *
Q: Did you go to his [Montgomery's] house or near his house on April 2nd?
A: Yes, I went to the little rise that go down, where you come out the main road to go down to his house, I went there.
Q: Was his car there?
A: No, it wasn't.
Q: And why did you go down there?
A: Because my son left home at 3:00 o'clock [sic] going down there.
Q: And what's your son's name?
A: Leon David Tyler.
* * * * * *
Q: And what was he going to do down there?
A: He was going to help him [Montgomery] finish planting his garden.
Q: And how did he go down there?
A: On my baby's bike.
Q: How old was your son?
* * * * * *
A: He was twenty-nine.
* * * * * *
Q: What was his mental condition?
A: He was retarded.
Q: When, after that, did you go down to the Montgomery house?
A: No, I never did go down there 'till the next day.[5]
* * * * * *
Q: When did you go back again?
A: That was 'bout 10:30 or 11:00 o'clock [sic].
Q: What did you do at that time?
A: I called the police.
(Vol. V, T. 660-662).
Frank McCann, Forensic Scientist with Mississippi Crime Laboratory, testified as follows:
Q: Let me show you what has been marked as Exhibits S-24, S-25, S-26, and S-27, pictures of the victims in the trunk of the car, and ask if you would to assume that the clothing that you examined came from these two victims.
A: This clothing is consistent with those  with the clothing in the two cans that we examined at the laboratory.
(Vol. VI, T. 829).
In closing argument the prosecutor stated:
BY MR. SMITH:
* * * * * *
Mrs. Lizzie Tyler, the first witness that was called, told you that the defendant and Cicero Montgomery were from the same neighborhood in Lincoln County, living close together, as does Mrs. Tyler, that she saw on April 2nd and the defendant just before noon; that she saw Cicero Montgomery, between 11:00 and 1:00 and that he was in his car on that day. She also said that about 3:00 her son, David Leon Tyler, rode his sister's bicycle down to Cicero Montgomery's house and that she never saw her son nor Cicero Montgomery again after that day, April 2nd, at 3:00. She said that she went down to Cicero Montgomery's house at 5:00 and that she saw the bicycle in the yard, which would certainly suggest that the young man had gone to the house, but she saw Cicero Montgomery's car missing. She went to the house again at 7:30 ... and again at 11:00 and finally called the police. Now, it was this call that set in motion the investigation of the house that has resulted in such an enormous amount of photographs and evidence that has been presented to you... .
*27 (Vol. VI, T. 946-47). There was no objection to this discussion. The prosecutor later re-emphasized Ms. Tyler's testimony that her son was missing, and Mackbee objected to this argument. Id. at Vol. VI 985-986.
In another part of his closing argument, the prosecutor stated the following:
This is a circumstantial evidence case and Mr. Allen makes a lot about that, that it's circumstantial, that there were no eyewitnesses to the crime, and he wants you to take that and say that because it's a circumstantial evidence case that the State hasn't met its burden. Well, let me ask you a question, ladies of the jury. Why is this a circumstantial evidence case, why were there no eyewitnesses at the house? Ladies and gentlemen, this is a circumstantial evidence case because the defendant killed the witnesses. Do you realize that?
(Vol. VI, T. 975). Mackbee failed to object to this argument.
* * * * * *
I submit to you, respectfully, that the person that murdered Cicero Montgomery was known, could have identified him; that is the only reason for Mr. Montgomery's murder. That is because someone knew that Mr. Montgomery could identify them if ever given that opportunity, and when Leon Tyler came down there I submit the same situation was inevitable.
Id. at (Vol. VI, 979). Mackbee failed to raise an objection.
* * * * * *
Circumstantial evidence is evidence other than an eyewitness identification. Mrs. Tyler was here. She made an in Court [sic] identification of someone that was at her house just briefly on the night of April 2nd, 1986 for a short period of time [speaking of Austin]... . I submit to you that the person that was at the car that was stopped on Highway 42 can be no person other than the man that murdered and robbed Cicero Montgomery. It can't be any other person, it has to be that person, because at that time in the trunk of that car at approximately 4:30, certainly not enough time to drive back to Lincoln County, in the trunk at that time were two  let me rephrase that  was one body, one dead person, and one man that was still alive, that was still breathing, that was not dead. The person that was driving that car 
BY MR. ALLEN: [Objection on basis that no testimony was offered to that effect.]
BY THE COURT: ..., the jury is entitled to pass upon the evidence, and you will consider the evidence as you remember it to be. Very well.
(Vol. VI, T. 986-987).

DISCUSSION OF THE LAW
Mississippi follows the general rule that in a criminal trial, proof of a crime or acts distinct from that alleged on the indictment with respect to which the accused is not convicted is inadmissible evidence against the accused either for impeachment purposes or as a part of the State's case in chief. Blanks v. State, 547 So.2d 29, 37 (Miss. 1989); Davis v. State, 530 So.2d 694, 697-7 (Miss. 1988); Robinson v. State, 497 So.2d 440, 442 (Miss. 1986); Walker v. State, 473 So.2d 435, 442 (Miss. 1985); Tobias v. State, 472 So.2d 398, 400 (Miss. 1985); Neal v. State, 451 So.2d 743, 758 (Miss. 1984).
However, exceptions exist to the rule on inadmissible evidence of other crimes. Evidence of another offense is admissible when the offense is so clearly interrelated to the crime charged as to form a single transaction or closely related series of transactions. Robinson, supra, at 442; Davis, supra, at 698; Tobias, supra, at 400; Neal, supra, at 759. Mississippi Rules Evidence 404(b) provides: that "evidence of other crimes may be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
In Brown v. State, 483 So.2d 328 (Miss. 1986), the Court stated:
This state has long adhered to the rule that the issue on a criminal trial should *28 be single and that the evidence should be limited to what is relevant to the `single' issue. Evidence of a prior criminal activity on the part of one criminally accused is inadmissible where the prior offense has not resulted in a conviction. We have held, however, that the State has a `legitimate interest in telling a rational and coherent story of what happened....' Where substantially necessary to present to the jury `the complete story of the crime' evidence or testimony may be given even though it may reveal or suggest other crimes.

Id. at 330 (citations omitted) (emphasis added). See also, Davis v. State, 530 So.2d 694 (Miss. 1988); McFee v. State, 511 So.2d 130 (Miss. 1987); Robinson v. State, 497 So.2d 440 (Miss. 1986); Davis v. State, 476 So.2d 608 (Miss. 1985).
In Neal, supra, the Court found that evidence of two other murders was admissible because "they were integrally related in time, place and fact with the murder" of which the defendant was being tried. (citations omitted) 451 So.2d at 759. The Court stated, "we are concerned here with the State's legitimate interest in telling a rational and coherent story of what happened ..." Id. This Court held that the confession would not have been coherent, rational, or worthy of belief if the other crimes were dissected from the statement. In the instant appeal we have no such confession of the defendant involved, but the state still has a legitimate interest in putting together the pieces of this puzzle before the jury.
As we walk through the various instances where there was testimony or evidence presented regarding two bodies, there was substantial justification in referring to the two bodies. For example, in his opening statement the prosecutor's comments concerning the revelation that a second person was missing were necessary in putting together the pieces of this case. We must remember that there were at least two crime scenes involved in the case sub judice. The discovery of the bodies in the trunk of Montgomery's car in Forrest County led investigators back to Montgomery's home in Lincoln County.[6] Subsequent to or simultaneous with the commencement of this investigation, law enforcement agents received information from Tyler's mother that he was missing, and the last time she saw him he was headed to Montgomery's home.
With regard to the officers' testimonies concerning what they discovered in the trunk of Montgomery's car, their responses were unavoidable. The officers only testified to what they found during their investigation. Moreover, the pictures entered into evidence during the officers' testimonies, depicted what was present at the scene of the crime. The investigators were obligated to investigate the scene in the condition that they found it. Furthermore, when investigators enter a scene, they do so with the responsibility of preserving evidence. They generally have no knowledge of how the state intends to prosecute the criminal in the particular case.
Simply put, the investigators did not know that Mackbee would be charged in separate indictments for the murders. They did not know that they would have to fix their cameras in such an angle which would do the impossible  photograph only one body in the trunk. The only way they could do this was to remove one body from the top of the other. Of course this would lead them open to an accusation of tampering with the evidence. On the contrary, the investigators properly memorialized the scene of the crime, and this was essential in establishing Montgomery's cause of death. The officers had to do it that day (ie., take the pictures of the scene as found) for they could not reconstruct the scene on the day of the trial to conform with the prosecutor's decisions in prosecuting the case.[7]
*29 Turning to the testimony presented by Tyler's mother, we find just as the trial judge, her testimony was far more probative than prejudicial. She was the only witness who could testify to seeing Mackbee in the Hopewell Community near Montgomery's house. This substantially complemented the officers' testimonies regarding the presence of Mackbee's footprints at Montgomery's home. Moreover, Mrs. Tyler was able to discuss what Mr. Montgomery was doing (or preparing to do) on the day he was killed. According to her, her son was going to assist Montgomery with his garden. In addition, she was able to give some important time frames, i.e., the time she saw Mackbee; the time she saw Montgomery; the time her son left home and went to Montgomery's home; the times that she approached or went to Montgomery's home; and the time that she called the police. Her testimony also was noteworthy because she insisted that she never saw another car at Montgomery's, and she only saw the bicycle that her son rode to his house. Mackbee had the opportunity to shake her testimony regarding her memory, perception or anything else, but he chose not to cross-examine her. (Vol. V, T. 665).[8]
We finally note that the prosecution's closing argument merely summed up the evidence that had been presented at trial. It allowed him to relay the state's story in a complete and coherent manner.[9] Moreover, the fact that Tyler went to Montgomery's home and never returned substantiates the state's argument that Mackbee had the motive to get rid of all possible witnesses to avoid detection. Furthermore, the fact that Mackbee did not object to many of the instances he now considers prejudicial weighs against his contention today. And, finally the instructions given to the jury detail that Mackbee was on trial for the murder of Cicero Montgomery.
In the end we reject this assignment.

III.

PROSECUTORIAL CONDUCT WAS ERROR UNDER MISSISSIPPI LAW AND VIOLATED MACKBEE'S RIGHT TO A FUNDAMENTALLY FAIR, NON-ARBITRARY CAPITAL PROCEEDING.
Mackbee contends that certain comments made during prosecutor's closing argument, taken in conjunction with the inflammatory photographs and the evidence of other crimes arguments made in his second proposition, constitute prosecutorial misconduct. Specifically, Mackbee contends that the prosecutor erred in his argument concerning the status of the decedent and with the prosecutor's comparison of Mackbee's exercise of his constitutional right to that of the victim's.
First, Mackbee complains of the prosecutor's closing argument concerning the status of Montgomery where he stated:
Ladies of the jury, we are not here today because a substantial citizen of the community was murdered. We are not here today because someone that was a politician or well-known or wealthy was killed. We are here today because Cicero Montgomery was killed, and while he may not have been wealthy or prominent or a leader in his community, he was a human being and he had a right to be protected by the law.
* * * * * *
Well, Cicero Montgomery has a few rights. He has the right for law enforcement to be concerned about his case, no matter his age, no matter his color, no *30 matter his station in life, and ladies and gentlemen, the officers were concerned.
(T. VI, 973-974).
Mackbee contends that the prosecutor's emphasis to the jury that he should be convicted because the victim had no status in the community, is as prejudicial as the prosecutor arguing that the victim was the most prominent person in the community. He contends the "value" of the victim's life should not be a factor in considering whether Mackbee should live or die, and such a consideration introduces an arbitrary factor in to the process.
Secondly, Mackbee challenges the prosecutor's comparisons of Mackbee's exercise of his constitutional rights to Montgomery's rights during closing argument where the prosecutor stated:
The defendant has had a fair trial, he had rights, and those rights have been protected. He's had competent lawyers. He's had his case proven against him beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. He's had the right to confront and cross examine and he has the right to a unanimous verdict by you ladies on the jury, and he has the right to be found guilty only if the State proves beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. Let me challenge you about the rights Cicero Montgomery had. There is one right, by the way, that the defendant does not have; he does not have a right for this jury to find him not guilty, he does not have that right. Cicero Montgomery had some rights, too, and how many times have you heard that the defendant has all the rights, and the victim does not have any rights. Cicero Montgomery has a few rights. He has the rights of the law enforcement to be concerned about his case, no matter his age, no matter his color, no matter his station in life, and ladies and gentlemen, the officers were concerned. He has the right for me, as an elected official, that represents the people where he lives to come to court, be it in Lincoln County or Covington County and present his case, just as strong as I would anyone else's, and I can assure you that I have done it. He has a right to expect that this jury will consider the evidence, and if you believe beyond a reasonable doubt that the defendant, who is sitting right over there, killed him when he was robbing him, then he has the right to expect that you will return a verdict of capital murder.
(Vol. VI, T. 974-975). (Emphasis added by appellant).

DISCUSSION OF THE LAW
In response to Mackbee's complaint that the prosecutor erroneously pointed to Montgomery's status in the community, we first note that Mackbee failed to enter an objection. That aside, we also note that the statement was just as innocuous as the statements in Turner v, State, 573 So.2d 657, at 671 (Miss. 1990). ("[P]rosecutor simply said that [the victim] was a wonderful old lady, who had committed herself to years of hard work and that she was an institution). With regard to the remaining statements, Mackbee again chose not to object to these comments. Without a contemporaneous objection, the claim is waived. Turner, supra; Lockett v. State, 517 So.2d 1317 (Miss. 1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988); Crawford v. State, 515 So.2d 936 (Miss. 1987). But cf. Griffin v. State, 557 So.2d 542, 551-54 (Miss. 1990) (Contemporaneous objection is not needed where defendant has been denied a fundamentally fair trial).
This assignment is also rejected.

IV.

ERRONEOUS INTRODUCTION OF A PHOTOGRAPH OF THE DECEDENT'S TRACHEA, CUT OPEN DURING AUTOPSY, AND OTHER PHOTOGRAPHS WITH NO PROBATIVE VALUE.
Over Mackbee's objections, the State introduced one autopsy color photograph, as well as other alleged inflammatory photographs. (Vol. IV, T. 579-82; 492-493). *31 Mackbee argues that the admission of gruesome photographs, including an autopsy photograph of Montgomery's trachea, had no evidentiary value and served the sole purpose of "inflaming the minds of the jury." He contends the autopsy photograph was particularly inflammatory, in that it showed a close-up of Montgomery's neck cut open by the pathologist. (Vol. IV, T. 563-567).
Additionally, the court permitted the prosecutor to introduce photographs S-24, S-25, S-26, S-27, which showed the bodies of Montgomery and Tyler. (Vol. IV, T.V., 509-11). In particular, photograph S-26 graphically showed the intestines of Tyler exposed and hanging from his body. In overruling Mackbee's objection, the court recognized that to an extent the pictures may have been gruesome, but they were the scene the witnesses saw when the trunk was open. (Vol. IV., T. 492-93).
Mackbee argues that the photos of Tyler were extraordinarily gruesome and were not necessary to establish Mackbee's role in the murder of Montgomery. He further argues that the admission of an autopsy photo and other photos only served to direct the jury's deliberation by exposing it to cumulative inflammatory matters. Mackbee contends that the photos added nothing to the jury's understanding of how Montgomery died, even less to determining who was culpable in his death. Consequently, Mackbee argues that by admitting the photographs the court abused its discretion and made it impossible for Mackbee's guilt or innocence to be determined in a fundamentally fair forum.

DISCUSSION OF LAW
A general rule of this court leaves the admission of photographs into evidence to the sound discretion of the trial judge. Her decision is upheld unless there has been an abuse of that discretion. Stringer v. State, 548 So.2d 125, 134 (Miss. 1989). "[P]hotographs which are gruesome or inflammatory and lack an evidentiary purpose are always inadmissible as evidence.'" McNeal v. State, 551 So.2d 151, 159 (Miss. 1989) quoting McFee v. State, 511 So.2d 130, 135 (Miss. 1987).
In Williams v. State, 544 So.2d 782, 785 (Miss. 1987), the defendant objected to the admission of several photographs which recorded, inter alia, the victim's heart and larynx separated from her body at the autopsy; her body as found at the scene of the murder; close up views of her chest at the autopsy; and enlarged close up views of the wound to her genital area. In discussing the submission of these photographs into evidence, this Court stated:
We have [admitted repeatedly] photographs of every description with the explanation that some "probative value" is present ... Abuse of discretion is sometimes explained to be admission of photographs when a killing is not contradicted or denied or the corpus delicti and the identity of the deceased have been established... .
A review of our case law indicates that the discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value. At this point in the development of our case law, no meaningful limits exist in these so-called balance of probative/prejudicial effect of photographs test.
Id. at 785 (citations omitted); But cf. McNeal, supra (photographs were gruesome and lacked any evidentiary purpose and their probative value was outweighed by their prejudicial effect).
With this in mind, we turn to those photographs that Mackbee insists should not have been admitted. He first complains that the photographs which showed the bodies of Montgomery and Tyler. In particular, he complains that S-26 should not have been admitted because it "graphically shows the intestines of David Leon Tyler exposed and hanging from his body." (Brief of Appellant at 23) (emphasis by Appellant).
We already have explained the importance of the pictures taken at the scene of the crime. See, supra, at 20-1. These pictures supplemented the officers' testimonies *32 concerning what they found in the trunk of Montgomery's car; what they found at the scene. Moreover, in taking the pictures, there was no way the investigators could take a picture of Mackbee's body without also having Tyler in the photograph, unless they tampered with the evidence. These pictures were necessary and their probative value outweighed their prejudicial effect.
Mackbee also objected to the introduction of a photograph which showed the result of an autopsy of Montgomery's body. Specifically, he asserts that this picture in particular was inflammatory because "it showed a close-up of the decedent's neck cut open by the pathologist." (Brief of Appellant at 22). In condemning this photograph of Montgomery's trachea, Mackbee relies on Hickson v. State, 472 So.2d 379 (Miss. 1985). In Hickson, the prosecutor displayed before the jury the decedent's deformed hands pickled in a jar of formaldehyde even though they had not been admitted into evidence. Id. at 388, 384. While condemning the prosecutor's actions, this Court stated:
Little common sense is required to perceive that display of anatomical parts of a homicide victim may adversely affect the fairness of the trial atmosphere. Once the severed organ or limb has been seen, no amount of instruction or admonition from the trial judge may dispell [sic] the indelible imprint of its impression upon the juror's mind. There is no antidote for the poison other than a mistrial.
Id. at 472 So.2d at 385 (footnote omitted).
Mackbee's reliance on this case is misplaced. In Hickson we condemned the use of "pickled" body parts. Nevertheless, we hesitated in forbidding this evidence in all cases and our holding was narrow. Moreover our discussion continued:
We proceed today in the context of the use of anatomical parts which have not been received into evidence. We hesitate, however, to suggest a hard and fast rule that such may never be used as evidence. There may come a day when the presentation of some telltale heart to the jury is legitimately necessary to the administration of justice.
Id. (Emphasis in original).
Turning to the case sub judice, we have no actual body parts, pickled or otherwise, which were presented to the jury. We, however, do have a graphic and explicit color photograph. Although we do not endorse the state's use of pictures such as these in other cases, they were relevant and very probative in this case. During trial the state detailed a story which alleged that Mackbee knocked Montgomery unconscious  short of death and placed his live body in the trunk of his car and then burned him to death. The photograph substantiates the state's theory. The photograph provides graphic evidence that Montgomery's trachea was lined with soot; therefore, Montgomery died of smoke inhalation. This photograph together with the testimony provided by the state was also used to assure that Mackbee would not be entitled to a lesser included instruction on manslaughter.
In the final analysis, we hold that the photographs were more probative than prejudicial. We disagree with Mackbee, and we believe that the photographs added to the jury's understanding of how Montgomery died. Although the state should not attempt in every case to enter into evidence photographs of autopsied body parts, or body parts in general, these pictures were essential in this case in piecing together the puzzle of Montgomery's murder. And, finally we again caution trial judges to consider carefully all the facts and circumstances surrounding the admission of any photograph. More specifically, the trial court must consider: "(1) whether the proof is absolute or in doubt as to identity of the guilty party, as well as, (2) whether the photographs are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury." McNeal, 551 So.2d at 159. (emphasis added)
In the end, Mackbee's assignment is rejected.

*33 V.

THE PROSECUTOR'S USE OF PEREMPTORY STRIKES TO EXCLUDE POTENTIAL BLACK JURORS VIOLATED THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
Mackbee, a black defendant, relies on Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and insists that the prosecutor improperly used his peremptories in striking black jurors from the venire. Accord Davis v. State, 551 So.2d 165 (Miss. 1989); Chisolm v. State, 529 So.2d 635 (Miss. 1988); Conerly v. State, 544 So.2d 1370 (Miss. 1989). After timely objecting to these objections, the trial judge gave the prosecutor an opportunity to explain each challenge.
After evaluating the explanations given and the evidence before him, the trial judge made a finding, inter alia, that the prosecutor gave sound and non-racial reasons for each black juror, who was struck. (Vol. III, T. 222-23). After reviewing the record and the briefs in this case, we support the trial judge's findings. Because a trial judge's findings on issues such as these are accorded great deference and will not be reversed unless they are clearly erroneous or against overwhelming weight of the evidence, see, Lockett v. State, 517 So.2d 1346, 1350 (Miss. 1987), we reject this assignment.

VI.

WHETHER IT WAS ERROR FOR THE CIRCUIT JUDGE TO GRANT INSTRUCTIONS S-1-2 AND S-1-3, DUE TO SAID INSTRUCTIONS BEING INCORRECT AND ABSTRACT JUDGMENTS OF THE LAW AND FAILING TO INSTRUCT THE JURY ON AN ELEMENT OF THE CRIME OF CAPITAL MURDER.
Here Mackbee challenges the following jury instructions:
S-1-2: Robbery is defined as the taking of the personal property of another, in his presence or from his person and against his will, by such violence to his person or by putting such person in fear of some immediate injury to his person. Therefore, if you believe from the evidence in this case, beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence, that the defendant, Frank Mackbee, took money or other personal property belonging to Cicero Montgomery, from his person or in his presence by violence or by putting the said Cicero Montgomery in fear of immediate injury to his person, then you may find that the defendant was engaged in the crime of robbery.
S-1-3: The defendant, Frank Mackbee, has been charged by an indictment of the crime of capital murder for having caused the death of Cicero Montgomery while engaged in the commission of the crime of robbery. If you find from the evidence in this case, beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence, that the defendant was engaged in the criminal act of robbery which began in Lincoln County, Mississippi, and further that the defendant, did willfully, without authority of law and of his malice aforethought and with deliberate design killed Cicero Montgomery, a living person while he, the said Frank Mackbee, was engaged in the commission of the crime of robbery, although the death of Cicero Montgomery may have occurred in another county, then you should find the said Frank Mackbee guilty of capital murder.
(Vol. I, T. 151-52).
Mackbee argues that the above jury instructions on the underlying offense of robbery were confusing and vague and failed to include an essential element. Mackbee contends that the instructions fail to indicate what specifically the state alleges to be the acts constituting robbery. He contends that the instructions allow the jury to find the element of armed robbery if the defendant took "money, or other personal property" from the victim Montgomery. Thus, he asserts that neither the indictment nor the instructions gave the defendant *34 notice that the robbery might encompass taking a car or a body.
Additionally, Mackbee argues that neither instruction mentions the element of robbery known as "felonious intent". He contends that in order to prove the crime of robbery, one must show: (1) felonious intent, (2) force, or putting in fear of, as a means of carrying out that intent, (3) asportation. (Brief of Appellant at 36).
The State contends that the instructions at issue were somewhat tailored to fit the facts. That is, the instructions simply stated what occurred by accurately describing the crime. The State argues that the instructions at issue define the elements of robbery, including the use of the word robbery as felonious intent to steal. The State submits that when both instructions are read together, they are clarifying as opposed to confusing. Thus, the jury was fully instructed as to the elements of both the crime of robbery and the crime of capital murder.

DISCUSSION OF LAW
MISS. CODE ANN. § 97-3-73 (1972), provides, "every person who shall feloniously take the personal property of another in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person, shall be guilty of robbery."
MISS. CODE ANN. § 97-3-19(2)(e) (Supp. 1990), provides:
The killing of a human being without authority of law by any means in any manner shall be capital murder in the following cases when done with or without any design to effect death, by any person engaged in the commission of the crime of ... robbery, ... or any attempt to commit such felonies... .
Jury instructions are to be read as a whole and no one instruction is to be taken out of context of the whole. Jackson v. Griffin, 390 So.2d 287, 290 (Miss. 1980); Alexander v. State, 250 So.2d 629, 632 (Miss. 1971); see also Murphy v. State, 566 So.2d 1201, 1207 (Miss. 1990). Additionally, the mere fact that an instruction is abstract or lacks specificity is not ground for reversal. See Ruffin v. State, 447 So.2d 113, 119 (Miss. 1984). Likewise, a jury instruction is proper and there is no reversible error in it when the instruction is tailored specifically to the facts of the case. Fairley v. State, 467 So.2d 894, 901 (Miss. 1985). Cf. Murphy, 566 So.2d at 1206 (an instruction may be rejected if it incorrectly states the law, is without foundation in the evidence, or is stated elsewhere in the instructions).
In Johnson v. State, 475 So.2d 1136 (Miss. 1985), the appellant was convicted of murder. On appeal she complained, inter alia, that "feloniously" should have been included in a jury instruction. There, the Court held that "synonymous phrases or interchangeable words may be used in a jury instruction and the jury will be properly instructed." Id. at 1140 citing Lancaster v. State, 472 So.2d 363, 367 (Miss. 1985); Erving v. State, 427 So.2d 701 (Miss. 1983). The Court stated further that, "without authority of the law" is synonymous with "feloniously". Id.
The language "without authority of the law" was used in jury instruction S-1-3; therefore, when S-1-3 is read with S-1-2, robbery was defined correctly tracking the language of the statute. Additionally, Instruction S-1-3, states the facts of the case. Therefore, in accordance with the preceding case law and reading all of the instructions as a whole, this issue lacks merit.

VII.

WHETHER MACKBEE'S INDICTMENT FOR CAPITAL MURDER, WHICH FAILED TO ALLEGE OVERT ACTS/ELEMENTS CONSTITUTING THE CRIME OF ATTEMPTED ROBBERY OR ROBBERY GAVE HIM INSUFFICIENT NOTICE OF THE NATURE AND THE CAUSE OF THE CHARGES AGAINST HIM.
Mackbee's capital murder indictment alleges that the murder of Montgomery was committed while Mackbee was "engaged in the commission of the crime of robbery... ." (Vol. I, T. 3). Mackbee argues *35 that the capital murder indictment was void for failure to specify overt facts committed during the course of the robbery. Thus, Mackbee contends the lack of notice concerning the underlying felony renders his conviction void. Mackbee further contends that because of such voidness no procedural requirement exists to demur to the indictment. (Brief of Appellant at 7).

DISCUSSION OF LAW
MISS. CODE ANN., § 99-7-21 (1972), provides in pertinent part:
All objections to an indictment for a defect apparent on the face thereof shall be taken by demurrer to the indictment, and not otherwise before the issuance of the venire facias in capital cases, ..., and not afterward. The Court for any formal defect, may, if it be thought necessary, cause the indictment to be forthwith amended, and thereupon the trial shall proceed as if such defect had not appeared.
MISS. CODE ANN. § 99-17-20 (Supp. 1990), provides in pertinent part:
No person shall be tried for capital murder or any other crime punishable by death as provided by law, unless such offense was specifically cited in the indictment returned against the accused by setting forth the section and sub-section number of the Code defining the offense alleged to have been committed by the accused... . Any conviction of the accused for an offense punishable by death shall not be valid unless the offense for which the accused is convicted shall have been set forth in the indictment by section and sub-section number of the Code which defined the offense allegedly committed by the accused.
Procedurally, Mackbee failed to raise this argument at the trial level, and therefore it is barred under § 99-7-21. On the merits, Mackbee's argument still fails because the indictment further read, "contrary to and in violation of § 97-3-19(2)(e) of the Mississippi Code of 1972," which is the statutory provision for capital murder. Thus, the indictment was in compliance with § 99-17-20. See, Bullock v. State, 391 So.2d 601, 606 (Miss. 1981); Bell v. State, 360 So.2d 1206, 1208-09 (Miss. 1978). This issue lacks merit.

VII.

WHETHER THE PROSECUTOR FAILED TO ESTABLISH BEYOND A REASONABLE DOUBT THAT A MURDER OCCURRED DURING THE COURSE OF AN ARMED ROBBERY
Mackbee insists that the state failed to prove beyond a reasonable doubt that he was guilty of robbery. More specifically he asserts that the state failed to support these essential elements of the crime in violation of state law and the due process clause of the United States Constitution.
To support his contention, Mackbee relies on Commonwealth v. Williams, 379 Pa.Super. 538, 550 A.2d 579 (1988), cert. denied, 522 Pa. 612, 563 A.2d 498 (1989) and concludes that Montgomery had to have been aware that his property was being taken for a robbery to have occurred. The Williams Court had before it a Pennsylvania statute which provided: "A person is guilty of robbery if, in the course of committing a theft, he physically takes or removes property from the person of another by force however slight." 18 Pa. C.S.A. § 3701(a)(1)(v). Williams provided an opportunity for the court "to determine whether robbery or theft occurs when an unconscious, intoxicated victim is rolled over onto his side and his wallet is stolen out of his pants pocket." 550 A.2d at 580.
In reversing the defendant's conviction, the state supreme court discussed several of its prior cases and concluded that those cases "indicate that the phrase `force however slight' envisions that the victim must be aware of the force and, because of the force, feel compelled to part with his or her property." 550 A.2d at 582. In one of the cases relied on by the majority in Williams, a defendant, who came up behind the victim and took her pocketbook by pulling it off her arm, was convicted of robbery. Id. citing Commonwealth v. Brown, 506 Pa. 169, 484 A.2d 738 (1984).
*36 In affirming the conviction the Brown Court explained:
... The force used in taking the purse from the victim's arm was a harmful touching of the person, accompanied with sufficient force to compel the victim to part with the conscious control of her property, and supports a robbery conviction under § 3701. This conduct substantially differs from the case of the thief who merely takes the property of another with intent permanently to deprive him thereof, using no force or threat of force on the victim  like the pickpocket... . Such conduct is non-violent, poses no threat to the victim who is unaware of the taking, and is accordingly graded less severely than robbery. A victim who is aware of the taking of property from his person is apt to reflex action to protect himself and his property and thus may be injured by the felon... . [R]obbery has always been considered a greater harm against society because violence is caused or threatened. The ordinary citizen has the right to go about his way free from the fear of attack to his person from those who would deprive him of control over his goods. That right is violated even by the slight tug on the arm by the purse thief who must use force to wrench the purse from the arm of the victim without regard to her safety.
484 A.2d at 742. (Emphasis added). See also Commonwealth v. McNair, 376 Pa. Super. 604, 546 A.2d 688 (1988) (constructive force or actual force is sufficient to support robbery conviction); Commonwealth v. Smith, 333 Pa.Super. 155, 481 A.2d 1352 (1982) (force however slight does not include the taking by stealth alone because a taking by stealth alone is not as likely to result in injury to the victim as the taking by force).[10]
While relying on these cases, Mackbee puts forth the following proposition:
Assuming that a robbery occurred in Lincoln County, the robbery was completed long before Cicero Montgomery was killed sixty miles away and three hours later in Forrest County. The robbery was complete at the time the appellant allegedly took the decedent's wallet or car in Lincoln County. Therefore, the killing did not take place during the commission of robbery.
(Brief of Appellant at 38).
We have disposed of a similar issue in Wheat v. State, 420 So.2d 229 (Miss. 1982). In Wheat, this Court considered all that occurred during the night in question, the condition of the body of the victim, and the fact that Wheat was seen in full possession of the victim's car. This Court found that whether the victim was robbed was clearly a question for the jury. 420 So.2d at 238-39.
We find that there was enough evidence to support the jury's verdict in the case sub judice. We have announced time and time again our standard of review for challenges to the legal sufficiency of the evidence. See, e.g., Jones v. State, 567 So.2d 1189, 1191 (Miss. 1990); Garrett v. State, 549 So.2d 1325, 1331 (Miss. 1989); McFee v. State, 511 So.2d 130, 133-34 (Miss. 1987); and Fisher v. State, 481 So.2d 203, 213 (Miss. 1985). Without repeating that standard here, we note that the jury was instructed fully that it was necessary for them to find that Mackbee had the intent to rob when the act of the killing was done. The evidence offered at trial put Mackbee in the same community (neighborhood) as Montgomery on the date in question; there was evidence of violence in Montgomery's home; within a few hours Mackbee was seen approximately 60 miles from the Hopewell Community in the possession and control of Montgomery's car; and Montgomery's personal effects were found in the general vicinity of the car. Such evidence of the acts of the accused and circumstances surrounding such actions served at least to show intent which the jury considered and resolved.
Incidentally, Mackbee's insinuation that Montgomery was not aware of the force, and thus there could be no robbery, is *37 without merit. A discussion of a sufficient analogous proposition is found in 2 LaFave and Scott, Substantive Criminal Law, § 8.11, p. 443 (1986). In discussing if a deceased person can be a "person" for purposes of robbery, the commentators provided this illustration:

A, after an argument with B, during which B hit A on the head with a bicycle pump, stabbed B, killing her (thus committing the crime of manslaughter), and then, erroneously believing B to be unconscious but alive, took money from B's dress. The court affirmed A's conviction of robbery, holding that a homicide victim is still a "person" within the meaning of the robbery statute, at least when the interval of time between the infliction of the fatal blow and the taking of the property is short.
Id. (Citation omitted). In the footnote to this illustration, the commentators stated: "Doubtless it would have been even easier to hold it to be robbery if A had killed B for the very purpose of taking his money or property." Id. at n. 30. (Emphasis added). This footnote continues by explaining that robbery does not include the stealing of money or property from a deceased person for whose death the thief was in no way responsible  "not so much because the deceased is not a a `person' as because the requirement that the defendant use force or fear on the victim is missing." Id.
The authors also provide this enlightening discussion of the phrase "in the presence," which is included in our definition of robbery, see, supra, p. 30.:
... `Presence' in this connection is not so much a matter of eyesight as it is one of proximity and control: the property taken in a robbery must be close enough to the victim and sufficiently under his control that, had the latter not been subjected to violence or intimidation by the robber, he could have prevented the taking.

Id. (footnote omitted).
In the end, the assignment is without merit for the evidence supports the jury's verdict in this regard.

IX.

UNDULY SUGGESTIVE IN-COURT IDENTIFICATION
Mackbee's counsel made a motion to the court to either remove Mackbee from the courtroom or place him in the audience among persons of his race whenever the State attempted to elicit identification testimony from a witness. The court denied the motion stating, "[W]e are not going to play hide and seek, no, we are not going to play hide and seek in the courtroom or Easter egg hunt, or anything of that sort... ." (Vol. I, T. 43-5). Mackbee contends that because he was the only black male seated at counsel table during the in-court identification, such was highly suggestive. Mackbee submits that "in a totally circumstantial capital case, it cannot be argued that a highly suggestive in-court identification was merely harmless." (Brief of Appellant at 41).

DISCUSSION OF THE LAW
Without going into too much detail with this assignment, we note that Mackbee challenges the in-court identifications of several of the witnesses. Each of these witnesses had more than a sufficient opportunity to get a good look and up-close examination of him on the day of the crime. At least two of the witnesses had assisted him in extinguishing an apparent fire when he was parked alongside of the road in Forrest County. Another witness drove him around on the front seat of his taxi.
What is more important, however, is that there had been prior photographic line-ups where several of the witnesses chose Mackbee's picture from the array. The propriety of these line-ups neither has been questioned nor alleged to have been suggestive. Based on the precedents established in Smith v. State, 430 So.2d 406, 407-08 (Miss. 1983), White v. State, 532 So.2d 1207, 1213-114 (Miss. 1988), Estes v. State, 533 So.2d 437, 442 (Miss. 1988), Reed v. State, 536 So.2d 1336, 1339 (Miss. 1988), Saucier v. State, 562 So.2d 1238, 1246 (Miss. 1990), and Powell v. State, 566 So.2d 1228, 1235-239 (Miss. 1990), we find no merit to this assignment.

*38 X.

THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THE VENUE IN LINCOLN COUNTY
In this assignment, Mackbee asserts that the state did not prove the venue of the criminal offense because it presented no evidence to establish that the victim was killed during the commission of a robbery in Lincoln County.

DISCUSSION OF THE LAW
Just as the previous assignment, we reject this contention without any detail. MISS. CODE ANN. § 99-11-19 (1972) provides:
When an offense is committed partly in one county and partly in another, or where the acts, effects, means, or agency occur in whole or in part in different counties, the jurisdiction shall be in either county in which said offense was commenced, prosecuted, or consummated, where prosecution shall be first begun.
The record amply demonstrates the occurrence of foul play in Hopewell Community of Lincoln County at Montgomery's home. This is where the crime began. We, therefore, must reject this assignment.

SENTENCING PHASE

I.

THE TRIAL COURT'S REFUSAL TO INSTRUCT THE JURY ABOUT THE LEGAL EFFECT OF A PRIOR SENTENCE, AND THAT FRANK MACKBEE WAS INDICTED AS AN HABITUAL OFFENDER AND ELIGIBLE TO SERVE A LIFE SENTENCE WITHOUT PAROLE VIOLATED THIS COURT'S RULE IN DAVIS V. STATE, 512 SO.2D 1291 (MISS. 1987).[11]
Mackbee requested the following instructions which were refused by the trial court:
JURY INSTRUCTION D-11-3: If sentenced to life imprisonment, Frank Mackbee must serve this sentence consecutive to other sentences he has previously received. In ____ he was returned to Parchman to complete service on an ____ year sentence of which he had served ____ and he had received a second consecutive sentence of ____ years without possibility of parole. If sentenced to life imprisonment, the defendant would not be eligible for parole. (Vol. I, T. 190).
JURY INSTRUCTION D-11: Frank Mackbee has been indicted as an habitual offender. If given a life sentence, Frank Mackbee may never be eligible for parole because he will be an habitual offender. (Vol. I, T. 191).
JURY INSTRUCTION D-2-4a: If given a life sentence, Frank Mackbee will never be eligible for parole because he will be an habitual offender. (Vol. I, T. 193).
JURY INSTRUCTION D-2-5: You need not find a mitigating circumstance in order to impose a sentence of life imprisonment. In addition, even if you find that the mitigating circumstances are outweighed by the aggravating circumstances, you may impose a sentence of life imprisonment. You may extend mercy out of compassion or belief that life imprisonment, served consecutive to the defendant's other terms of imprisonment is sufficient under all the circumstances. (Vol. I, T. 194).
In our most recent case which explains the necessity for instructing the jury on the effect of a defendant's habitual offender status, we held that the jury should have been informed of the defendant's ineligibility of parole. Turner v. State, 573 So.2d at 674.
In the case sub judice, the need for granting this instruction is compelling because the state was permitted to use Mackbee's *39 prior convictions and sentences in aggravation to support a sentence of death. (Vol. VI, T. 1005-6). In doing this, the state submitted the following evidence which substantiated Mackbee's prior sentence for armed robbery:
... It is, therefore, considered by the Court and so Ordered and Adjudged that the defendant, Frank Mackbee, for such his crime of Armed Robbery be imprisoned in the Penitentiary of the State of Mississippi for and during the space of Ten (10) Years, the last five years suspended on probation.

SO ORDERED AND ADJUDGED on this the 26th day of January, 1977.
(Vol. VI, T. 1006, Ex. S-P-1) (emphasis added).
By submitting this evidence, the prosecution accomplished its goal to show that the defendant had been convicted previously. Not only did the instruction do this, but it also informed the jury that Mackbee was on probation at the time that he committed the capital murder of Montgomery. Therefore, the jury was aware that Mackbee had not been required to serve his full sentence.
We have recognized the qualitative difference between a death sentence and a sentence of life imprisonment. See, Jackson v. State, 337 So.2d 1242, 1252 (Miss. 1976); Pinkton v. State, 481 So.2d 306, 308 (Miss. 1985); Jones v. State, 461 So.2d 686, 690 (Miss. 1984). "Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). Consequently, the jury must have before it as much information as possible when it makes its sentencing decision. Turner, supra, at 674, Cf. Tokman, 564 So.2d 1339 (Miss. 1990) (characterizing as critical the need for defense counsel to present mitigation evidence at capital proceedings. Defense counsel found ineffective because he failed to present any mitigation evidence, and there was a reasonable probability that the balance of aggravating and mitigating factors would have been different and a life sentence returned; Davis, 512 So.2d 1291 at 1293 (Miss. 1987) ("Mississippi allows `evidence of mitigating circumstance of an unlimited nature.'") quoting Leatherwood v. State, 435 So.2d 645, 650 (Miss. 1983). Accord, Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987) (holding unconstitutional instructions requiring jury to consider only those mitigating factors listed by statute while excluding relevant mitigating factors.); Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (holding that exclusion during sentencing hearing of testimony that defendant had made a good adjustment during his time in jail denied defendant the right to introduce relevant mitigating evidence); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (constitutional demand for individualized consideration means that a sentencer cannot exclude as a matter of law any relevant mitigating evidence). See also, Note, The Meaning of "Life" for Virginia Jurors and Its Effect on Reliability in Capital Sentencing, 75 Va.L.Rev. 1605, 1609-610 [hereinafter, The Meaning of Life] (Woodson, inter alia, provides that defendant is entitled to introduce and to have the sentencer consider, any evidence in mitigation of his offense relating to his character and record or to the circumstances of the offense. And, it also provides that the state must structure the sentencing process to ensure that any death sentence reflects a reliable determination that death is the appropriate punishment in the particular case.)[12]
When the state placed the prior sentence before the jury, without an instruction fully explaining the potential current legal consequences of such a sentence, it had the further detrimental effect of erroneously *40 implying to the jurors that Frank Mackbee could get out on probation, or parole, if given a life sentence. The jury logically could think that since Mackbee got out on probation for his prior conviction, he would get out on parole if given a life sentence.
As two commentators have noted:
... [T]he typical juror at the sentencing phase of a capital trial perceives the imposition of a sentence of "life imprisonment" to mean there is a good chance that the capital defendant will in fact be released from prison on parole... . The option of life to a typical juror means disproportionately little punishment for the convicted capital murderer. A juror, then, laboring under the misperception that a sentence of "life" is a ticket to "get out of jail free" on parole, feels constrained to vote for a penalty of death... .
Paduano and Smith, Deathly Errors: Juror Misperceptions Concerning Parole in the Imposition of the Death Penalty, 18 Col.Hum.Rts.L.Rev. 211, 211-12 (1987); Accord, The Meaning of Life, 75 Va.L.Rev. at 1620 ("common sense suggests that virtually any person given the responsibility of determining whether a convicted murderer should be condemned to death or sentenced instead to life imprisonment would want information about what `life' imprisonment really means.")
At a minimum, therefore, Mackbee had a right to have the jury told that his prior convictions and sentences would be considered to enhance the punishment if given a life sentence. More importantly, however, Mackbee should have been allowed to inform the jury that this enhancement meant life without parole. See Turner, at 675-76.
The state, on the other hand, argues that the bottom line is that Mackbee simply wanted the jury instructed on the parole system and on speculative matters. We rejected that argument in Turner, and we reject it again today.
The view that parole should not be considered by the sentencing jury has never been based on any notion that mention of parole was per se inadmissible. Parole prospects have no intrinsic irrelevance. Rather, the rule has arisen in the context of the general rule proscribing evidence that necessarily invites a high degree of speculation or conjecture. For example, in Walter Williams v. State, 445 So.2d 798 (Miss. 1984), the original case on the subject, the Court offered several reasons why in the context of that case the matter of parole should not have gone to the jury and said:
Parole is not automatic. No person sentenced to life imprisonment has any "right" to parole. Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 11, 99 S.Ct. 2100, 2105, 60 L.Ed.2d 668, 677 (1979); Davis v. State, 429 So.2d 262, 263 (Miss. 1983). Allowing argument or testimony regarding the possibility of the defendant someday being paroled is in effect inviting the jury to speculate how ten years in the future the parole board may exercise its legislatively granted discretionary authority. This would introduce into the sentencing proceedings an "arbitrary factor" proscribed by Section 99-19-105(3)(a).
Williams, 445 So.2d at 813. We have reaffirmed this view only recently in Jessie Derrell Williams v. State, 544 So.2d 782, 798 (Miss. 1989).
We have recognized repeatedly the speculative nature of parole in other contexts. In Grantham v. Dept. of Corrections, 522 So.2d 219 (Miss. 1988), we explained the point:
The decisions whether one in custody should be granted parole is attended with broad discretion, Miss. Code Ann. § 47-7-17 (1972), as parole is more a matter of grace than of right. Williams v. State, 445 So.2d 798, 813 (Miss. 1984); Davis v. State, 429 So.2d 262, 263 (Miss. 1983).
Grantham, 522 So.2d at 226. See Harden v. State, 547 So.2d 1150, 1152, (Miss. 1989).
There is one notably and empirically demonstrable exception to this premise. Persons sentenced as habitual offenders under Miss. Code Ann. § 99-19-83 (Supp. 1990) are not eligible for parole. The point has been *41 routinely observed in our reports, see, e.g., Caldwell v. State, 443 So.2d 806, 813 (Miss. 1983), reversed on other grounds, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) ("There is almost always a possibility of parole in every case, except cases involving persons convicted and sentenced as habitual criminals.") (emphasis added); Wiley v. State, 484 So.2d 339, 345 (Miss. 1986) (same).
To sum up the point on this issue, in other contexts we allow our judges to impose sentences on defendants:
If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a defendant and the crime he committed in order to be able to impose a rational sentence in a typical criminal case, then accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision.
Gregg v. Georgia, 428 U.S. 153, 190, 96 S.Ct. 2909, 2933, 49 L.Ed.2d 859, 884 (1976).
Moreover,
[t]he evidence from capital cases is strong that the possibility of the capital defendant's soon being back on the street is in the forefront of the typical juror's mind while balancing the factors involved in deciding whether a defendant should die. A state of affairs where the capital sentencing jury is allowed to wander unguided through the maze of its own misperceptions is unconscionable and affords the constitutional principle that juror discretion in capital cases be adequately channeled.
18 Col.Hum.Rts.L.Rev. at 256; Accord, Turner, at 674-75 ("Informing the jury that the alternative to the death penalty is life without benefit of probation or parole, can only enhance the sentencing process, insuring that excessive punishment shall not be inflicted.") (citations omitted).
In light of prior cases and as complemented by Turner and this opinion and the constitutional principles that have evolved in our death penalty jurisprudence, we reverse and remand this case for a new sentencing hearing. It was error for the trial court to deny Mackbee's instruction which detailed the effect of his habitual offender indictment.[13]
We, therefore, affirm Mackbee's conviction and determination of his habitual offender status. We, however, reverse and remand for new sentencing hearing so that a new jury, when presented with all appropriate evidence, can impose a sentence.
AFFIRMED IN PART, REVERSED AND REMANDED IN PART.
*42 DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN and BLASS, JJ., concur.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PITTMAN, J., concur in guilt phase and dissent to sentencing phase.
HAWKINS, P.J., dissents by separate written opinion joined by ROY NOBLE LEE, C.J.
ROY NOBLE LEE, Chief Justice, concurring in guilt phase and dissenting to sentencing phase:
I do not agree that the lower court erred in its refusal to grant an instruction that appellant was an habitual offender and would never be eligible for parole. In my view, the majority opinion errs in reversing and remanding the case to the lower court for a new trial on the sentencing phase, Issue XI, for failure to grant such an instruction. I adopt my dissenting opinion in Turner v. State, 573 So.2d 657 (Miss. 1990), and Berry v. State, 575 So.2d 1 (Miss. 1990) which cases involve the same question.
HAWKINS, P.J., and PITTMAN, J., join this opinion.
HAWKINS, Presiding Justice, dissenting:
For reasons stated by Chief Justice Lee in his dissent in Berry v. State, 575 So.2d 1 (Miss. 1990), and those stated by Chief Justice Lee and Justice Pittman in Turner v. State, 573 So.2d 657 (Miss. 1990), I respectfully dissent.
ROY NOBLE LEE, C.J., joins this opinion.
NOTES
[1] Before arriving at this destination, however, Mackbee inquired the fare from Hattiesburg to New Orleans and Hattiesburg to Biloxi. (Vol. II, T. 241-42).
[2] Other facts will be detailed where necessary.
[3] The record is not real clear on whether the officers were responding initially to Mrs. Tyler's call or if they had begun their investigation of the car and bodies found in Lincoln County.
[4] We note that the jury was given an instruction on murder. (Vol. VI, T. 935-36).
[5] Mrs. Tyler testified that she went to the hill to check on her son at approximately 5:30 p.m. and between 7:30 and 8:00 p.m. She did not approach the house because she only saw the bike and not Montgomery's car.
[6] According to Lampton's opening statement, when the officers arrived they saw the bicycle and then they began to ask questions. Consequently, they learned that someone else (Leon Tyler) also was missing. (Vol. IV. T. 420).
[7] On another note, the testimony concerning the autopsy was limited in scope. The trial court allowed the testimony not to show the condition of Tyler's body, but to show the condition of Montgomery's body. (Vol. IV, T. 569).
[8] While the fact that Tyler was retarded was of little relevance and should have been avoided, the testimony concerning his mental capacity did not prejudice Mackbee's rights.
[9] We could only imagine how inconsistent and incoherent the stories would have been if only some of the investigators testified that they only discovered one body, and the other officer unwittingly testified to seeing two bodies. Even if all officers testified that there was only one body, there was still the possibility that the medical examiners would mention conducting two autopsies. Had each of these individuals testified to observing only one body, the pictures still would have reflected two bodies. This would either have confused the jury or, more likely, permitted them to infer a different conclusion.
[10] Consequently, the Williams Court reversed the defendant's conviction because the victim was not aware of the force used to roll him over. Id. 550 A.2d at 582.
[11] We emphasize that we only refer to federal authorities for illustrative purposes. The conclusions that we reach are based on the State Constitution. See, Michigan v. Long, 463 U.S. 1032, 1042, 103 S.Ct. 3469, 77 L.Ed.2d 1201, 1214 (1983). Accord Killingsworth v. State, 490 So.2d 849 (Miss. 1986).
[12] Because of these considerations, we held in Turner that conducting the sentencing phase of a defendant's trial prior to the phase during which the defendant's habitual offender status is determined "narrows" a jury's consideration of clearly relevant information that could "cause it to decline to impose the death sentence." Turner, at 675, quoting McClesky v. Kemp, 481 U.S. 279, 304, 107 S.Ct. 1756, 1773, 95 L.Ed.2d 262, 286.
[13] On remand, we would direct the trial court's attention to Shell v. Mississippi, ___ U.S. ___, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990 (per curiam). There the Supreme Court held that the limiting instruction as used in this case was insufficient. As explained by Justice Marshall:

... [A] limiting instruction can be used to give content to a statutory factor that `is itself too vague to provide any guidance to the sentencer' only if the limiting instructions own `definitions are constitutionally sufficient, `that is, only if the limiting instruction itself `provide[s] some guiadnce to the sentencer... . The trial courts definition of `heinous' and atrocious' themselves, the phrases `extremely wicked or shockingly evil' and `outrageously wicked and vile' could be used by `a person of ordinary sensibility [to] fairly characterize almost every murder.' ... Indeed, there is no meaningful distinction between these latter formulations and the `outrageously or wantonly vile, horrible and inhuman' instruction expressly invalidated in Godfrey v. Georgia, [446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (plurality opinion)].
Nor is it of any consequence that the trial court defined "cruel" in an arguably more concrete fashion than "heinous" or "atrocious." ... "It has long been settled that when a case is submitted to the jury on alternative theories the unconstitutionality of any of the theories requiries that the conviction [or verdict] be set aside." ... Even assuming that the trial court permissibly defined "cruel," the instruction in this case left the jury with two constitutionally infirm, alternative bases on which to find that petitioner committed the charged murder in an "especially heinous, atrocious or cruel" fashion... .
There is no legally tenable distinction, in sum, between this case and Maynard v. Cartwright [486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988)].
Id. at ___, 111 S.Ct. at 314, 112 L.Ed.2d at 4-5, (Marshall, J., concurring). (citations omitted) (emphasis in original).