969 So.2d 891 (2007)
Derrick BROWN a/k/a Derrick Latory Brown a/k/a Dedrick Brown, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2005-KA-02291-COA.
Court of Appeals of Mississippi.
January 23, 2007.
Rehearing Denied May 29, 2007.
*892 David L. Walker, attorney for appellant.
Office of the Attorney General by W. Glenn Watts, attorney for appellee.
Before KING, C.J., CHANDLER and ROBERTS, JJ.
CHANDLER, J., for the Court.
¶ 1. After a jury trial, Derrick Brown was found guilty of sale of cocaine. The Circuit Court of Tate County sentenced Brown to fifteen years in the custody of the Mississippi Department of Corrections, with six years suspended pending future good behavior, and to pay a fine of $5,000. Brown appeals, arguing (1) that his federal and state constitutional rights to confront the witnesses against him were violated by the trial court's erroneous admission of hearsay evidence and (2) the trial court erroneously denied his proffered jury instruction on the entrapment defense.
¶ 2. We find that the trial court erroneously admitted hearsay evidence that substantially prejudiced Brown. Therefore, we reverse and remand this case for a new trial. We find Brown's other issue to be without merit.

*893 FACTS
¶ 3. Antonio Echols occasionally worked as a confidential informant for the Panola County Narcotics Task Force. In 2003, Echols telephoned Elmer "Little Fudge" Armstrong and arranged to buy crack cocaine. During the call, Armstrong used three-way calling to call two other men who also spoke with Echols. On November 3, 2003, Echols contacted Commander Jason Chrestman of the Panola County Narcotics Task Force. Echols communicated that he could buy four ounces of crack cocaine from an individual. The location of the sale was to be a Wal-Mart in Senatobia in Tate County.
¶ 4. Then, Echols went to the Task Force offices and made a telephone call to certain unidentified individuals. The individuals told Echols that they could sell him only two ounces of crack cocaine. Echols agreed to the sale. This call was recorded by the Task Force with Echols's knowledge. After the phone call, the Task Force placed an audio wire on Echols's body and gave him $1,600. Echols went to the Wal-Mart in Senatobia to await the sale. Officers from the Task Force, the Drug Enforcement Administration in Oxford, and the Tate County Sheriff's Department positioned themselves in parked cars in and near the Wal-Mart parking lot. Echols stood in the parking lot for about two hours, during which he made several more calls to the individuals to inquire about their progress toward the buy location. Initially, the individuals told Echols that they would be driving a blue Monte Carlo, but later told him they would be driving a white Delta 88. These calls were also recorded by the Task Force with Echols's knowledge. Echols testified at the trial that he did not know to whom he had been speaking on the phone. Nor was any law enforcement officer who testified able to identify the persons with whom Echols had spoken.
¶ 5. The officers observed a white Oldsmobile Delta 88 automobile pull into a gas station near the Wal-Mart parking lot. Two men were in the car, one in the driver's seat and one in the passenger's seat. A man in a red shirt exited the passenger's side of the car. Then, the car drove into the Wal-Mart parking lot and approached Echols where he was standing. Echols opened the rear passenger's side door of the car. According to Echols's testimony, the driver told him to get in the car. Echols replied that he would not ride anywhere, but showed the driver the money. The driver said he would be right back. Then, Echols closed the car door, and the driver returned to the gas station parking lot. The man with a red shirt got in the passenger's seat of the car, which then returned to where Echols was standing. Echols got into the back seat of the car. The car pulled into a parking spot. Echols testified that, inside the car, the man in the passenger seat handed Echols a baggie, and Echols handed him the $1,600. Echols put the baggie on a scale while the man in the passenger's seat counted the money. Then, officers descended on the car and arrested the driver, identified as Derrick Brown, and the passenger, identified as Derrick Black, who was wearing a red shirt. Echols received $600 for his work as a confidential informant.
¶ 6. The contents of the baggie were later determined to be 1.53 ounces of crack cocaine. The money recovered from the scene was identified by its serial numbers as the buy money given to Echols. The car was registered to Black's sister. A video showing the car's activities at the gas station and of the arrest was introduced into evidence. Several cell phones were found inside the car, and a box of sandwich bags was found in the trunk. Agent Jamie *894 Tedford of the Drug Enforcement Agency testified that it is normal for narcotics to be sealed in sandwich bags. Tedford further testified that he interviewed Brown after advising him of his rights. Tedford related that Brown said that the drugs had been supplied by Little Fudge in Tunica County. Brown also gave Tedford a description of Little Fudge's vehicle and residence.
¶ 7. Officers from the three law enforcement agencies involved in the arrests all testified that there were no prior reports of drug activity by Brown. Officer Chrestman testified that the target of the investigation was Elmer "Little Fudge" Armstrong, not Brown or Black. Chrestman stated that he had learned Brown's name for the first time when he arrested him. Chrestman stated that the Task Force did not end up charging Armstrong.
¶ 8. Brown testified that he lived in Tunica, Mississippi and had known Armstrong and Black since grade school. According to Brown, on November 3, 2003, he planned to go to the Wal-Mart in Senatobia in order to put a toy for his son on layaway. Brown told Black about the plan, and Black said he "was going to go that way too" and suggested they travel together. Black asked Brown to drive because Black had no driver's license. When they neared Wal-Mart, Black asked to be dropped off at the gas station; Brown assumed Black wanted to use the bathroom there. Brown dropped off Black and told him he was going to continue to Wal-Mart.
¶ 9. Brown further testified that, as he drove toward Wal-Mart, Echols stopped him. Brown did not know Echols. Brown indicated to Echols that he was confused about why Echols had stopped him, and Echols showed him some money. Brown testified that he thought Echols must be looking for Black. Brown picked up Black from the gas station and then picked up Echols. Black and Echols transacted the drug sale. Brown testified that he had not previously known that a drug sale would occur. Brown maintained that he would never have come to Senatobia with Black had he known about the drug deal. Brown further testified that he had never told police that the drugs had come from Little Fudge.
¶ 10. The jury found Brown guilty of the sale of cocaine as an aider and abettor. The court overruled Brown's motion for a new trial.

LAW AND ANALYSIS
I. THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S OBJECTION TO THE INTRODUCTION INTO EVIDENCE OF A TAPE RECORDING OF ANTONIO ECHOLS AND UNKNOWN INDIVIDUAL AND THE TRANSCRIPT THEREOF.
¶ 11. During Echols's testimony, the State proffered the Task Force's audiotape recording of Echols's telephone conversations prior to the drug sale as well as a transcript of the tape recording. Echols testified that the transcript fairly and accurately reflected the taped conversations. Brown objected to the admission of the tape and transcript on the bases of hearsay and violation of Brown's right to confront the witnesses against him because the persons on the tape had not been identified and thus could not be subpoenaed as witnesses. The trial court admitted the tape and transcript into evidence. The court held that, because the persons to whom Echols had been speaking were unidentified, the tape was admissible for the purpose of showing that the conversations took place and the gist of those conversations. The trial court instructed the jury that the transcript was admitted for *895 the purpose of aiding the jury in following the content of the conversation, and that the jury should disregard the transcript to the extent that it found the transcript to be unreliable or incorrect.
¶ 12. The tape was played for the jury. The following is excerpted from the transcript:
[first phone call]
MB1: Hey what happen . . . what happen man?
MB2: What happened?
MB1: . . . I'm already in Senatobia man. (Inaudible) N****r ain't got but two left now.
MB2: Ain't got but two left.
MB1: A . . . a . . . hey go on and bring two of them then. Bring them two. I need them real bad man.
MB2: I'm fixing to do that man. I don't know you. You don't know me but you know I'm fixing to come over there.
MB1: Hey I'm being watched now man. Hey you going to have the phone?
MB2: Yeah I'm going to be in a blue Monte Carlo man.
MB1: You going to be in a blue Monte Carlo?
MB2: Yeah
MB1: (Inaudible) If I was you I'd probably in and out of Wal-Mart because there be a lot of you know security around. I'm going to be in and out of Wal-Mart.
MB2: All right
MB1: Like I'm shopping. Then I'll be calling you.
MB2: I tell yall I'm on my way now man.
MB1: I'm all ready up there man.
MB: A . . . yall bring the scales too cause I aint got no scales.
MB1: I'm going to bring the scale.
. . . .
[second phone call]
MB1: Hello. Where you at man?
MB2: [ ] I'm . . . what you want hard or soft man. You never did say?
MB1: I want it hard man.
. . . .
MB1: How long you going to be man?
MB2: About thirty-five minutes.
. . . .
MB1: What . . . What you going to be man?
MB2: I'm going be in a blue Monte Carlo.
MB1: You wouldn't be sh**ting me man?
MB2: Hey look man you at Wal-Mart man?
MB1: Yeah I'm at Wal-Mart.
MB2: All right I'll be there.
. . . .
[third phone call]
MB1: You on your way man?
MB2: Yeah I'm on my way now (Inaudible)
MB1: All right
MB2: (Inaudible) twenty five minutes.
MB1: Are you in a old model or new model? I'm going to be looking for you?
. . . .
MB2: Huh . . . in a white Delta 88 man
MB1: You going to be in a white Delta 88?
MB2: (Inaudible)
MB1: O.K. you know how long you're going to be about what?
MB2: About twenty minutes
MB1: All right I'm waiting on you man man.
. . . .
[fourth phone call]
MB2: Hello.

*896 MB1: How far are you man?
MB2: Give me about two minutes man.
MB1: (Inaudible) I don't want to miss you man. That's why I'm steady calling man. I'm going to call you in about another five minutes you be on it.
MB2: All right Rick.
MB1: All right.
. . . .
[another phone call]
MB1: Hello
MB2: Hello
MB1: Man
MB2: Yeah I got your (Inaudible)
MB1: H**l yeah man (Inaudible) security guard hangs around man.
MB2: S**t give me about . . . about ten minutes man.
MB1: All right
MB2: (Inaudible) hooked up
MB1: Come on man (Inaudible)
MB2: Hey you know where that store is man?
MB1: What store?
MB2: Right across . . . you know where that little gas station (Inaudible)
MB1: That little gas station?
MB2: Yeah since you're going to be sitting in the parking lot you know what I'm saying.
MB1: Yeah
MB2: You outside of Wal-Mart?
MB1: We're right here I told you I'm going to see you when you pull up man. I'm going to be right . . . I'm going to see you when you pull up.
MB2: All right what did you say you were in?
MB1: I'm . . .
MB2: Or are you walking?
MB1: Yeah. I'm with my bride but I'm going to be walking out where I can see you though man.
MB2: All right Rick.
MB1: Hey I'm going to see you when you come in (Inaudible) though man.
MB2: All right Rick.
MB1: All right.
. . . .
¶ 13. Several aspects of the tape are apparent from the portions of the transcript quoted above. The Task Force designations MB1 and MB2 appear to refer to the sequence of statements, and not to designate that the statements were made by alternate speakers or to indicate how many speakers participated in the conversations. The transcript reflects that, during the conversations, someone addressed someone else as "Rick." The Court has listened to the tape recorded conversations, which were accurately transcribed. The tape has poor sound quality; while at least two male voices are discernable, it is impossible to tell how many people were involved in the conversations. We note that Echols testified that more than one person was on the phone with him. The only evidence as to which of the statements on the tape were uttered by Echols was Echols's testimony that the men asked him if he wanted hard or soft cocaine, and he replied that he wanted hard cocaine, and that the men said they were coming in a blue Monte Carlo and later changed it to a white car.
¶ 14. Prior to Echols's testimony, Commander Chrestman also testified that he was unable to identify all of the parties to the taped conversations. During Brown's cross-examination of Commander Chrestman, Brown's attorney asked Chrestman whose voices were on the tape. Chrestman replied, "The [confidential informant] and an individual from Tate County. As far as who it was on the other end of the line, I couldn't tell you." Then, Chrestman clarified that the "individual" to whom *897 he referred was from Tunica County, not Tate County. Chrestman further stated that he was unable to identify the individual from Tunica County.
¶ 15. Brown argues that the tape recording constituted hearsay and that its erroneous admission prejudiced him, requiring a new trial. This Court reviews the trial court's evidentiary rulings for abuse of discretion. Lewis v. State, 573 So.2d 719, 722 (Miss.1990). When the trial court's admission or exclusion of evidence constitutes an abuse of discretion, this Court will not reverse unless the error affected a substantial right of a party. M.R.E. 103(a). Mississippi Rule of Evidence 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(d) enumerates certain statements that are not hearsay though "they literally fall within the definition of hearsay from the hearsay rule." M.R.E. 801 cmt. These include prior statements by witnesses and admissions by a party-opponent. M.R.E. 801(d)(1); M.R.E. 801(d)(2).
¶ 16. Brown argues that the tape-recorded out-of-court statements of the unidentified persons constituted hearsay because the statements were admitted for their truth. The State responds that the statements were admissible to corroborate the testimony of Echols and the law enforcement officers that a monitored telephone call had occurred that finalized the drug purchase. Both Brown and the State rely upon Burton v. State, 875 So.2d 1120, 1121-22 (¶¶2-4) (Miss.Ct.App.2004). In that case, an informant purchased crack cocaine from Burton on behalf of the Panola-Tate County Narcotics Task Force. An audio and videotape recording was made of the transaction. Id. The audio portion of the tape recorded Keithdrick Hunt stating "here it comes" as Burton approached on his bicycle with the drugs. Id. at 1123-24(¶15). Hunt did not testify at the trial, and Burton argued that he had suffered a violation of his right to confront the witnesses against him. Id. at 1123(¶ 11). Burton also argued that the audio portion of the tape was inadmissible because Hunt's statement was hearsay. Id. at 1123(¶ 15).
¶ 17. This Court found that Burton's right to confrontation was not violated and that he could have subpoenaed Hunt. Id. at 1123(¶ 12). We found that Hunt's statement, "here it comes," was not inadmissible hearsay, either because it was not admitted for its truth or because it was a present sense impression admissible under Rule 803(1). Id. at 1123-24(¶ 15). We further observed that Hunt's statement was "hardly incriminating" considering the other portions of the tape. Id. at 1123(¶ 13). Finding that Burton had suffered no prejudice, we recognized that "the state has a `legitimate interest in telling a rational and coherent story of what happened.'" Id. (quoting Mackbee v. State, 575 So.2d 16, 28 (Miss.1990)). We found that Hunt's statement was "neither incriminating nor prejudicial to Burton's defense, and it was necessary for the State to present a complete, rational and coherent story of what happened." Id. at 1123(¶14).
¶ 18. Brown seeks to distinguish Burton because the persons on the tape sub judice were unknown and could not have been subpoenaed at the trial. The State argues that the taped conversations of Echols and some number of unidentified persons were admissible pursuant to the State's legitimate interest in providing the jury with "a rational and coherent story of what happened." Under the particular facts of this case, we disagree. Certainly, the State is correct in arguing that the taped conversations were not introduced *898 for the express purpose of proving the truth of the matters asserted therein. That fact is readily apparent from the record containing the trial court's ruling admitting the tape for the purpose of showing that the conversations took place and the gist of those conversations, in other words, to lend background to the drug transaction. However, there was copious testimony from Echols and law enforcement that conversations setting up the drug transaction took place. The evidentiary value of the tape for the prosecution's stated purposes was marginal.
¶ 19. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. M.R.E. 801(c). It is always inadmissible except as provided by law. M.R.E. 802. "The rule of non-hearsay imports an objective test. The question is not the actual subjective state of mind of the prosecuting attorney, much less of the declarant, but rather a matter of how a reasonable objective observer would under the circumstances be likely to perceive the statement." Harrison v. State, 722 So.2d 681, 684(¶8) (Miss.1998) (quoting Turner v. State, 573 So.2d 1335, 1338 (Miss.1990)). Considering the taped conversations objectively in light of all the other evidence, the most powerful evidentiary function of the taped conversations was to relay hearsay evidence to the jury tending to show Brown and/or Black's prior planning of the drug transaction.
¶ 20. For example, the jury heard a speaker on the tape tell Echols that they would be arriving in a white Delta 88, and there was other evidence that Brown arrived driving a white Delta 88 and then the drug sale occurred. Thus, the jury was invited to credit as truth the statement that the speaker would be arriving in a white Delta 88. In the same manner, the jury was also permitted to credit as truth the arrangement to bring two ounces of hard cocaine and a scale, and the statements about the speakers' progress to the buy location. Because the State presented no evidence identifying the persons on the tape, this Court is unable to determine whether the statements on the tape would be exempt from hearsay as admissions by a party-opponent under Rule 801(d)(2)(A) (in the case of Brown's own statements) or 801(d)(2)(E) (in the case of statements by a co-conspirator, Black, offered against Brown). As the declarants were anonymous, we also are unable to assess the applicability of any hearsay exceptions dependent upon the declarant's unavailability. M.R.E. 804. Further, insufficient evidence of the context of the anonymous declarant's statements was established by the proponent to enable our assessment of the applicability of hearsay exceptions under Rule 803.
¶ 21. Most troubling to this Court is the fact that the tape plainly could have led the jury to assume either that Brown was the person on the tape planning the drug transaction, or that Brown was riding in the car listening to Black planning the drug transaction. The tape was not introduced for that purpose and, without identification of the speakers, could not have been. Gayton v. State, 595 So.2d 409, 415 (Miss.1992) (the testimony of an undercover officer identifying the defendant as the speaker on a wiretap recording rendered the defendant's recorded statements both relevant and admissible under Rule 801(d)(2)). In this case, we find that the marginal relevance of the taped conversations pales in comparison with their capacity "to lure the factfinder into declaring guilt on a [different] ground" from that for which they were admitted into evidence. See Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). The trial court's admission of the taped conversations constituted an abuse of discretion.
*899 ¶ 22. Moreover, the erroneous admission of the taped conversations substantially prejudiced Brown, necessitating reversal and remand for a new trial. M.R.E. 103(a). Brown testified in his defense that, until the moment of the drug sale, he had not known or intended that any drug sale would occur. As already stated, the taped conversations invited the jury to assume either that Brown was the person on the tape planning the drug transaction, or that Brown was riding in the car listening to Black as Black planned the drug transaction. Therefore, the taped conversations substantially eroded the credibility of Brown's testimony. We have no choice but to reverse and remand this case for a new trial. Since we have granted the relief requested by Brown, we do not address his argument that the admission of the tape violated his federal and state constitutional rights of confrontation.
II. WHETHER THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S PROPOSED JURY INSTRUCTION D-6, AN ENTRAPMENT INSTRUCTION.
¶ 23. Brown argues that the trial court erred in refusing Brown's proffered entrapment instruction. The instruction stated:
The court instructs the jury that the Defendant has raised the defense of entrapment. Entrapment is an affirmative defense and must be proved by the Defendant. In this trial, the Defendant must prove two things before the Jury may consider the entrapment defense. Those two things are:
1.) That the State of Mississippi induced the Defendant to commit the criminal act or acts; and
2.) That the Defendant lacked the predisposition to commit the criminal act or acts.
If the Defendant has failed to prove both of these things, then the jury may not consider the defense of entrapment.
The trial court also refused Brown's jury instruction D-5, which correctly defined the defense of entrapment as: "the act of inducing or leading a person to commit a crime not originally contemplated by him for the purpose of trapping him for the offense." See Walls v. State, 672 So.2d 1227, 1230 (Miss.1996). The court refused the instructions upon a finding that there was no evidence that Brown ever had any conversations with agents of the State until meeting the confidential informant in the Wal-Mart parking lot.
¶ 24. The entrapment defense is affirmative and must be proven by the defendant. Id. at 1230. Before the defense may be raised, the defendant must make a prima facie showing of evidence of government inducement to commit the criminal act and the defendant's lack of predisposition to engage in the criminal act prior to contact with the government agents. Id. Predisposition and government inducement are questions of fact for the jury. Id. Once a prima facie case is made, three consequences follow: (1) the burden of production and proof is shifted to the prosecution, (2) predisposition becomes a fact of consequence and evidence thereof is relevant and admissible, and (3) the accused is entitled to have the entrapment defense submitted to the jury on proper instructions. Id. On appeal of the denial of an entrapment instruction, this Court asks whether sufficient evidence existed in the record such that a rational jury might have found for the appellant on the entrapment defense. Id.
¶ 25. Our courts have recognized two situations in which entrapment issues arise. Ealy v. State, 757 So.2d 1053, 1056(¶7) (Miss.Ct.App.2000). In the classic entrapment scenario, "an innocent *900 person with no prior criminal inclination is induced through persistent entreaties by undercover law enforcement agents to commit an offense." Id. In the other scenario, known as "supply and buy," law enforcement officers initially supply and later buy the contraband with which the accused commits the crime. Id. But, "[a] defendant is not entrappedand enjoys no protection from prosecutionwhen he is already predisposed to commit the crime and when law enforcement officials merely furnish him the occasion or opportunity for doing so." Tanner v. State, 566 So.2d 1246, 1248 (Miss.1990). Thus, for a successful entrapment defense, the defendant must show he was not "ready and willing" to commit the offense at the time the opportunity for doing so arose. Ealy, 757 So.2d at 1056(¶ 9). And, the court has held that an entrapment instruction is unnecessary where the defendant was merely asked by a law enforcement agent to sell the substance and was caught. Walls, 672 So.2d at 1231.
¶ 26. Brown testified that he personally had not sold cocaine to Echols and, prior to the cocaine sale, had not known a cocaine sale would occur. According to Brown's own testimony, he was not induced to violate the law, but rather never formed the intent to aid and abet Black's sale of cocaine. Though an entrapment defense was not supported by Brown's own testimony, Brown was entitled to assert inconsistent alternative theories of defense. Reddix v. State, 731 So.2d 591, 593(¶ 9) (Miss.1999). Brown argues that he was entitled to alternatively show that, if he did aid and abet the sale of cocaine, he was induced to do so by law enforcement. Considering the admissible evidence, other than Brown's testimony, concerning the arrangement of the cocaine sale, the evidence showed that Echols contacted Elmer "Little Fudge" Armstrong about buying crack cocaine. Then, Armstrong put Echols in touch with unknown individuals who arranged the quantity of the drugs, buy location, and other details with Echols. Subsequently, Brown drove up to Echols at the buy location and asked Echols to get in the car; Echols showed him money. A short time later, Brown picked up Black, returned and picked up Echols, and the drug sale transpired. There was no evidence that Echols or any other law enforcement agent ever asked to buy drugs from Brown. Nor was there evidence that Echols communicated his desire to buy drugs to Black in any way beyond merely offering Black money in exchange for the drugs. Therefore, there was insufficient evidence that Brown was induced to aid and abet the sale of cocaine to entitle Brown to an entrapment instruction. Walls, 672 So.2d at 1231. This issue is without merit.
¶ 27. THE JUDGMENT OF THE CIRCUIT COURT OF TATE COUNTY IS REVERSED AND REMANDED FOR A NEW TRIAL. ALL COSTS OF THIS APPEAL ARE ASSESSED TO TATE COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.